IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 3:21cr52/MCR

STEPHEN M. ALFORD
_____/

## FACTUAL BASIS FOR GUILTY PLEA

The Defendant admits that if this case were to proceed to trial, the government could prove the following facts.

On March 20, 2021, FBI agents met with and interviewed Victim D.G. (hereinafter referred to as "DG"). DG provided the following information concerning recent interactions with Person A and Defendant STEPHEN ALFORD:

On March 16, 2021, at 10:50 a.m., DG received a text message, only a portion of which is below, from telephone number XXX-XXX-2746:

*Mr. [DG],*

*I would like to talk with you immediately about the current federal investigation, and the indictment that is about to be filed against [a named family member of DG] (hereinafter referred to as "DG's family member").*

*I have a plan that can make his future legal and political problems go away.*

*Last summer, we located Robert Levinson in Iran and took two proof of life videos, but the U.S. government foiled our rescue attempt. We have one more opportunity to rescue Levinson. If you and [DG's family member] are willing to help us privately and clandestinely obtain the release of Robert*

1

FILED IN OPEN COURT THIS

11-22-21 /s/

CLERK, U.S. DISTRICT
COURT, NORTH DIST. FLA.

> *Levinson, I will ensure that [DG's family member] is on the plane that delivers Levinson to his family, thus making him the most sought after public figure in the world for his efforts to obtain Levinson's release. Then, my partner will see to it that [DG's family member] receives a Presidential Pardon, thus alleviating all his legal issues.*
>
> . . . . .
>
> *There is a gentleman who lives in near you… that both you & [DG's family member] know, who is the only person on the planet who can facilitate both Levinson's release from captivity and [DG's family member] pardon. I would like to arrange a meeting with you, me, and the gentleman in Niceville, or possibly at your house… within the next forty-eight hours to discuss this matter of national urgency.*
>
> . . . . .

On March 17, 2021, DG met with the individual who sent the text message, who is identified as Person A, in Destin, Florida. Relevant content of the meeting is summarized as follows:

    a.    During the meeting, Person A gave DG a three-page letter entitled "Project Homecoming." The letter contained information about a purported federal grand jury investigation involving DG's family member. The letter also detailed a plan to mitigate DG's family member's "legal and political troubles" by arranging for $25 million to be deposited into a trust account of Attorney A. Following the initial paragraphs containing information about a potential grand jury investigation of DG's family member, the letter stated, in part:

> *In exchange for the funds being arranged, and upon release of Robert Levinson, [DG's family member] shall be given credit for facilitating the*

2

*release of Mr. Levinson. [DG's family member] shall also be on the plane that returns Mr. Levinson to freedom and shall be the person to "reunite" Mr. Levinson with his family and bring Mr. Levinson back to the United States.*

*The team that delivers Mr. Levinson to the President of the United States shall strongly advocate that President Biden issue a Presidential Pardon, or instruct the Department of Justice to terminate any and all investigations involving [DG's family member]. The team has been assured by the President that he will strongly consider such matters because he considers the release of Robert Levinson a matter of National Urgency.*

. . . . .

*Robert Levison's release has been privately negotiated by certain United States and Mexican individuals and the costs associated with facilitating Robert Levinson's release is $25,000,000. A six-month, $25,000,000 loan is sought to immediately fund the release of Robert Levinson. The loan shall be repaid from the $25,000,000 Reward offered by the United States Government for the release of Robert Levinson.*

*The loan proceeds shall be deposited in the Trust Account of [an identified Pensacola, Florida, law firm], Attention: [Attorney A]. [Attorney A] shall be instructed that the funds shall be used at the sole discretion of the client, without limitations of amount and use – whether it be personal or business – and that his client shall have no requirement to document how funds are used.*

. . . . .

  b.  Person A told DG that his (Person A) partner could stop any investigation into DG's family member.

  c.  During the meeting, Person A used his cellular telephone to call the partner who Person A claimed had the connections to secure DG's family member's pardon. The partner indicated he wanted to meet with DG. Later on March 17, 2021, DG met with the partner in Destin, Florida. The partner

was Defendant STEPHEN ALFORD. Relevant content of the meeting is summarized as follows:

    a.    ALFORD told DG that ALFORD was raising funds to bring Levinson home. ALFORD told DG that ALFORD had gone to prison twice and that, because he had "kept his mouth shut" and did not implicate people who are now "very high up in the government," the administration owed him. ALFORD indicated he was going to use what was owed to him by the current administration to get DG's family member pardoned or to get any investigation of DG's family member to cease if DG deposited the $25 million as directed.

    b.    ALFORD also told DG that DG needed to contact Attorney A for more information. ALFORD told DG that the terms have already been agreed to; he (ALFORD) just needed the money.

During the meeting with ALFORD, DG received a text message from ALFORD using telephone number XXX-XXX-3886 that contained contact information for Attorney A, including Attorney A's direct work phone number and Attorney A's cellular phone number.

On March 26, 2021, DG met with Attorney A at Attorney A's Pensacola law firm. The meeting was consensually monitored/recorded. The following is a summary of relevant portions of the meeting:

4

a. DG explained that he was confused and troubled by his meetings with Person A and ALFORD. DG stated that Person A stated there was a purported federal investigation into DG's family member and that he (Person A) claimed he had a way to make it end. Attorney A stated that he had heard rumors about an investigation involving DG's family member, but Attorney A was not a part of any effort to get DG to do something to get the government off DG's family member.

b. When asked about whether they needed $25 million, Attorney A said he knew they needed funds, but did not think it was "anywhere near" $25 million. Attorney A explained there was a need for "up front money," and money needed to influence "Iranian officials."

On the morning of March 27, 2021, DG received a text message, a portion is below, from ALFORD using telephone number XXX-XXX-3886, the same telephone number from which ALFORD had previously texted information to DG.

*Good Morning [DG],*

*I am reaching out to you in regards to the meeting had with [Attorney A] yesterday afternoon.*

*[Attorney A] filled me in on the details of your conversation and I request an opportunity to meet with you today, if possible, so I can brief you on the latest events and the status of the Robert Levinson release project.*

*We have refined our efforts and believe that we can arrange Robert's release within the next two weeks if we move immediately. We also believe*

5

*we can secure Robert's release for a significantly lower amount than the $25M we discussed with you on the 17th.*

*Please let me know if I can meet with you today and discuss this most important matter. I promise you that the time we spend together will be both informative and beneficial.*

*. . . . .*

*Thanks for taking the time to review this message and I hope to hear from you.*

*With warmest regards,*

*Stephen Alford*

A meeting was arranged through text messages with ALFORD and, on March 29, 2021, DG met with ALFORD in Destin, Florida. The meeting was consensually monitored/recorded. Upon walking into the room, ALFORD stated, "Now, I'm not recording this, I hope you're not." A summary of relevant facts is noted below:

    a.    During the meeting, DG showed ALFORD the three-page letter provided by Person A. ALFORD told DG that he (ALFORD) wrote the letter. ALFORD stated to DG, "I just hope you don't use that against me in any way, shape or form."

    b.    The following statements were made by ALFORD during the meeting with regard to money:

        1.    "I need a million dollars in cash and four and a half million in [Attorney A's] hands that he will disburse as we tell him to do."

2. "What I can do is deliver this man back, and I'm begging you to help me do that because it gets me everything I want…I'm gonna get a pardon from it…where I really need your help if I pull this off is I need you to go see Governor DeSantis, and I need to get my state probation fixed."

3. "So, I'm here to ask you for a million dollars in cash and four and half million dollars put in [Attorney A's] account, and let me run. And I'll get that proof of life video by Sunday… and I'd like you to be able to have the ten million dollars lined up on the back end."

4. "I'm here today to ask for that fifteen million five hundred thousand dollars. Five point five up front and the ten on the back end when we show you the proof of life…I do need one million dollars in cash, and I need 4.5 million dollars in [Attorney A's] trust account… if you don't want to have dealings with me, and give it all to [Attorney A] and say that 'ALFORD uses this as he chooses.'"

5. "If you'd rather put 5.5 million in cash into this deal so there is no paper trail to you, carry it over to [Attorney A] and I'll take it from there."

6. "Would it be easier for you, DG, to keep it off the books by paying cash? Put it in cash . . . As long as it's between you and me

7

and [Attorney A], nobody else needs to know this. I mean, you've got the cover of the law firm... I just need a million dollars and 4.5 at my disposal."

7. "I'm not going to take your five million dollars and not produce a result."

c. The following statements were made by ALFORD with regard to promises made about DG's family member:

1. "Once I get that proof of life, I can get pretty much anything I want, including benefits for [DG's family member]...But I believe and I pretty much am one hundred percent confident that I can do one of two things. I can get any investigation against [DG's family member] dropped, but I don't trust the United States Department of Justice because I've been on the wrong side of them before, and I don't trust in the world of politics to be on the wrong side of any beef that [DG's family member] may have in the past, may have in the future... if I was [him/her] and/or you, I would want a full blown pardon. And I believe that if I have that proof of life video, and I have 72 hours before I deliver Robert Levinson, I can get [DG's family member] his pardon...If I wanted Bob Levinson to say, 'one of the conditions upon my release is [DG's family member] being pardoned,' he would say

8

that."

2. "I get him (Levinson) out, [DG's family member's] problems go away. [DG's family member] is going to be such a hero. Who can touch him?"

3. "I will get that pardon...a pardon can be kept out of the public eye...You can keep the pardon quiet."

4. "I will assure you that [DG's family member] will get off his problems."

5. "I'm afraid [DG's family member] is going to prison...I guarantee he won't if you help me."

d. During the meeting ALFORD claimed to have contacts within the White House who could produce the pardon for DG's family member. The following statements were made by ALFORD with regard to these assertions:

1. "I've pretty much been told I can give them [the White House] a list of who I want problems fixed."

2. "Can I get you in front of the President? Absolutely."

3.
    DG: You're telling me that you can get in to see the President?

ALFORD: Yes.

DG: And that the President of the United States will say to me that he can make this happen.

ALFORD: You won't have to put up another penny into it, yes. I will take you by the hand to see the President of the United States with that proof of life video.

e. The following statements were made by ALFORD with regard to the investigation of DG's family member:

1. "The FBI would not be this far along and the Justice Department would not have a grand jury involved if some of the facts aren't lining up the way they are lining up...They are strong facts, [DG]. I don't want to get into a discussion right now about who started them because that's a whole other can of worms that I have to be very careful about right now because I have seen grand jury testimony, and I have talked to one or two witnesses...in this matter. And I could get in deep shit if I reveal some of the stuff I know now...If you fund this initial 5.5 million dollars, I give you my word I will sit down and tell you everything."

On March 29, 2021, at approximately 7:33 p.m., ALFORD sent a text message to DG from telephone number XXX-XXX-3886 during multiple communications between the two, which implicated interstate commerce. The text message read as follows:

> *Would it be possible to just wire the entire $5.5M to [Attorney A's law firm] and we will get the cash? The PoL Video is in the works and to be delivered by Easter Sunday.*
>
> *I would hate to lose this opportunity. I can have [Attorney A] talk with you first thing in the morning as he is clearing his schedule for the next 12 days to manage this project.*
>
> *I will understand if it cannot be done but if I tell them I cannot get the funds, I don't get a second bite at this Apple.*
>
> *Just let me know and I will live with your decision.*
>
> *Thanks for taking the time to meet with me today.*

On April 2, 2021, ALFORD was confronted and interviewed by FBI agents regarding the facts and circumstances described herein. At that time, ALFORD told agents that he had, in fact, met with DG. ALFORD told agents that he had written the aforementioned three-page letter. FBI agents read the following statement from the letter: "*The team has been assured by the President that he will strongly consider such matters because he considers the release of Robert Levinson a matter of National Urgency.*" Agents asked ALFORD if his "team" had been given any such assurances by the President of the United States, to which ALFORD replied that

statement was "a lie." ALFORD's fraudulent scheme was thus making materially false promises to obtain millions of dollars from DG, though ALFORD knew he could not "guarantee" a pardon for DG's family member.

Sometime after the end of the interview, agents were able to seize the defendant's cellular telephone pursuant to a warrant. Thereafter, ALFORD was taken into custody on a federal arrest warrant. ALFORD agrees the Superseding Indictment is true and correct, and it is incorporated herein.

## Elements of the Offense

### COUNT 3 – Wire Fraud; PJI 051

(1) the Defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

(2) the false pretenses, representations, or promises were about a material fact;

(3) the Defendant acted with the intent to defraud; and

(4) the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

 

_____
RANDALL S. LOCKHART
Attorney for Defendant
Michigan Bar No. P58597
3 W. Garden Street, Ste. 200
Pensacola, Florida 32502
(850) 432-1418

11-19-21
_____
Date

_____
STEPHEN M. ALFORD
Defendant

x 11-19-21
_____
Date

JASON R. COODY
Acting United States Attorney

_____
DAVID L. GOLDBERG
Assistant U.S. Attorney
Northern District of Florida
Member of the Maryland Bar
21 East Garden Street, Suite 400
Pensacola, Florida 32502
(850) 444-4000

11/22/21
_____
Date

13