UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                                                    Case No.:    3:21cr052/MCR

STEPHEN M. ALFORD.
_____/

# ORDER

Defendant Stephen M. Alford pled guilty to one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.  Alford's Presentence Investigation Report ("PSR") recommends a 20-level upward adjustment to his base offense level under U.S.S.G. § 2B1.1(b)(1)(K), among other adjustments not challenged here, based on a loss amount of $25,000,000.[1]  The loss amount reflected in the PSR is calculated from an alleged "intended loss" that Alford sought to inflict, rather than any loss actually sustained by the victim.  Alford objects to the use of "intended loss" to determine his offense level under the Guidelines, as opposed to the actual loss amount of zero.  Having considered the applicable law and the parties' arguments, the Court finds that Alford's objection is due to be sustained.

---

[1] The PSR recommends three upward adjustments to Alford's base offense level of 7:  (1) a 20-level adjustment based on the loss amount; (2) a 3-level adjustment due to the victim's status and connection to the government; and (3) a 2-level adjustment for obstruction of justice.  After receiving three levels of credit for acceptance of responsibility, Alford's total offense level is 29 and the resulting Guidelines range is 140 to 175 months.

All sentencing proceedings must begin with a correct calculation of the applicable Guidelines range. *Peugh v. United States*, 569 U.S. 530, 536 (2013). In calculating this range, district courts are required by U.S.S.G. § 1B1.1 to first determine the base offense level, and then make appropriate upward or downward adjustments. *See also United States v. Booker*, 543 U.S. 220, 319 (2005). At issue in this case is § 2B1.1, which provides a graduated tier of offense level enhancements based on the amount of loss involved in a defendant's fraud. The main text of § 2B1.1 does not define "loss." The accompanying commentary, however, states that "loss" means "the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1 cmt. n.3(A). It further defines "actual loss" to mean "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" to mean "the pecuniary harm that the defendant purposely sought to inflict," which "includes intended pecuniary harm that would have been impossible or unlikely to occur." *See id.*, cmt. n.3(A)(i), (ii). Here, no actual pecuniary harm resulted from Alford's offense. However, Alford sought—but did not ultimately obtain—$25 million dollars in connection with his fraud, and that alleged intended loss is the basis for the loss amount in his PSR.

Alford objects to the use of intended loss to determine his offense level. More specifically, he argues that the plain meaning of the term "loss" in the text of § 2B1.1 only encompasses harm actually suffered by a victim, and not harm that may have

been intended by a defendant but did not, in fact, occur. In his view, the Guidelines commentary expanding the definition of "loss" to include intended loss is plainly erroneous and inconsistent with the unambiguous text of § 2B1.1, and therefore is not authoritative or owed deference by the courts. Applying this view here, where no actual loss resulted from Alford's offense, there would be no loss enhancement under § 2B1.1(b)(1)(K) and Alford's total offense level would drop from 29 to 9. Unsurprisingly, the Government argues for deference to the Guidelines commentary and the use of intended loss to calculate Alford's Guidelines range.

To properly apply the Sentencing Guidelines, courts must begin with the language of the Guidelines, including both the substantive text and the accompanying commentary. *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011) (quoting *United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003)). "A guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary." *United States v. Turner*, 626 F.3d 566, 573 (11th Cir. 2010); *see also Fulford*, 662 F.3d at 1177 (stating that a guideline's text must "be given its plain and ordinary meaning" because it is "presume[d] that the Sentencing Commission said what it meant and meant what it said"). The interpretive process is "governed by traditional rules of statutory construction, including the prohibition on rewriting statutes by adding or subtracting

words." *United States v. Shannon*, 631 F.3d 1187, 1189 (11th Cir. 2011) (internal cites omitted).

Guidelines commentary is different. Commentary that interprets or explains a guideline is considered "akin to an [administrative] agency's interpretation of its own legislative rules." *See Stinson v. United States*, 508 U.S. 36, 45 (1993). Consistent with principles of administrative law, interpretive commentary thus has generally been regarded as "authoritative" and entitled to "controlling weight" unless it violates the Constitution or a federal statute, or its application would result in a "plainly erroneous" or "inconsistent" reading of the Guidelines text. *See id*. at 38, 44-45. For decades, these principles were applied fairly "reflexive[ly]" and "without significant analysis of the underlying" guideline. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). The practical effect has been "uncritical and broad deference" (often referred to as *Auer*[2] or *Seminole Rock*[3] deference, based on the cases from which the principles derive) to the Guidelines commentary. *See United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021).

In 2019, the Supreme Court clarified the limits on deference to administrative agencies' interpretations of their rules and "reinforc[ed]" courts' obligation to "perform their reviewing and restraining functions" under the *Auer* paradigm. *See*

---

[2] *Auer v. Robbins*, 519 U.S. 452 (1997).

[3] *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945).

*Kisor*, 139 S. Ct. at 2414-15. Significantly for our purposes, *Auer* deference applies only in cases of "genuine" interpretive ambiguity. *See id*. at 2415. This means that "before concluding that a rule is genuinely ambiguous, a court must . . . carefully consider the text, structure, history, and purpose of [the rule], in all the ways it would if it had no agency to fall back on." *Id*. If there is no uncertainty as to the rule's meaning—that is, where "there is only one reasonable construction of" the rule—then "a court has no business deferring to any other reading, no matter how much [an] agency insists it would make more sense." *Id*. In that circumstance, the rule "just means what it means" and "the court must give it effect, as the court would any law." *Id*.

If genuine ambiguity remains after traditional tools of construction have been exhausted, the agency's reading still is not automatically due deference. *See id*. at 2415-16. Rather, the agency's reading must, among other requirements not pertinent here, "come within the zone of ambiguity" identified by the court after employing its interpretive tools."[4] *Id*. In this case, both sides agree that these aspects of the Supreme Court's decision in *Kisor* "set[] forth the authoritative standards for

---

[4] *Kisor* also explains that (a) *Auer* deference applies only to "authoritative" or "official" agency interpretations of an administrative rule rather than informal or "ad hoc" statements; (b) an interpretive rule must implicate the agency's "substantive expertise; and (c) the interpretation must reflect the agency's "fair and considered judgment" to receive *Auer* deference. *See Kisor*, 139 S. Ct. at 2416-18. None of these criteria are at issue in Alford's case.

determining whether" § 2B1.1(b)'s commentary defining "loss" to include "intended loss" is entitled to deference here.[5]

The text of § 2B1.1 does not define "loss," and neither side argues it is a term of art in this context. The Court thus begins, as it must, by employing traditional tools of statutory construction to determine whether "loss" as used § 2B1.1(b)(1) is genuinely ambiguous. *See Kisor*, 139 S. Ct. at 2414-15. It is worth noting at this point that neither the Supreme Court nor the Eleventh Circuit has considered this precise issue. Other circuits have turned to the "ordinary, contemporary, common meaning" of the term "loss" and, in doing so, have identified a "range of meanings that a reasonable person would understand a word like 'loss' to have." *See United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) (applying the *Kisor* framework and holding that "the commentary's $500 minimum loss amount for gift cards does not fall within the zone of any ambiguity" in the term "loss" under § 2B1.1(b)(1); *see also United States v. Kirilyuk*, 29 F.4th 1128, 1137-38 (9th Cir. 2022) (same). For example,

> one dictionary defines ["loss"] to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing

---

[5] The Eleventh Circuit has not yet considered the *Kisor* decision in the context of Guidelines interpretive commentary. However, it has applied the *Kisor* framework for *Auer* deference in other contexts. *See, e.g., United States v. US Stem Cell Clinic, LLC*, 998 F.3d 1302, 1308 (11th Cir. 2021) (observing that courts faced with a challenge to an administrative rule may "[no longer] . . . simply wave the ambiguity flag and defer to the agency's interpretation"); *see also Dobson v. Sec'y of Health & Hum. Serv.*, 2022 WL 424813 (11th Cir. 2022) (FDA interpretation of prescription coverage provision of Medicare Part-D statute); *Rafferty v. Denny's, Inc.*, 13 F. 4th 1166 (11th Cir. 2021) (Department of Labor interpretation of dual-jobs regulation).

> or being lost." American Heritage Dictionary of the English Language 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something" or "the person, thing, or amount lost." Webster's New World College Dictionary 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]imunition of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" 9 Oxford English Dictionary 37 (2d ed. 1989).

*See Riccardi*, 989 F.3d at 486. This Court's own consultation of contemporary dictionaries yielded similar definitions. *See, e.g., Loss*, MERRIAM-WEBSTER.COM DICTIONARY (2022) (defining loss to include the "physical, emotional, or especially economic harm or damage sustained"); *Loss*, THE BRITANNICA DICTIONARY (2022) (defining loss to include a "failure to keep or to continue to have something," and "the experience of having something taken from you or destroyed").

"These definitions show that 'loss' can mean different things in different contexts." *See Riccardi*, 989 F.3d at 486. It can encompass economic, emotional, and/or physical harms. *See id*. And "[e]ven in the economic realm," it "might cover only the precise value of, say, [an item] that is stolen . . . [o]r it might include the costs associated with" replacing the stolen item. *See id*. Nevertheless, there is at least one element shared by *all* of the "ordinary, contemporary, common meaning[s]" for the word "loss" in *all* of its various contexts—concrete materialization of harm. There is no reasonable construction of the "plain and ordinary meaning" of loss that includes harm that did not actually materialize. *See*

*Fulford*, 662 F.3d at 1177. The term is unambiguous in that respect.[6] Consequently, the Court "has no business deferring to any other reading" of the term, no matter how much the Government insists that doing so "would make more sense." *See Kiser*, 139 S. Ct. at 2415.

Based on the foregoing, it is clear that the Guidelines commentary defining "loss" to include "intended loss" is not due *Auer* deference. Section 2B1.1 is driven by "the amount of loss caused by the defendant's offense," *see United States v. Souffrant*, 517 Fed App'x 803, 821 (11th Cir. 2013), which plainly means, as explained above, the economic, emotional and/or physical harm that actually occurred. "Loss" cannot mean harm that never materialized. Yet the Guidelines commentary broadens the term "loss" to include harm of precisely that nature by inserting "intended loss" into its definition.[7] *See* U.S.S.G. § 2B1.1 at cmt. n.3(A)(ii). In doing so, the commentary does not "illuminate the meaning of 'loss,' but modifies it." *See Kirilyuk*, 29 F.4th at 1138. And the modification is so far afield from any contextual zones of ambiguity inherent in the ordinary meaning of the word "loss"

---

[6] Indeed, the *only* ambiguity is that created by the Sentencing Commission itself by inserting "intended loss" into the definition of "loss."

[7] Again, "intended loss" means "pecuniary harm that the defendant purposely sought to inflict" but did not inflict, and includes "intended…harm that would have been impossible or unlikely to occur." *See* U.S.S.G. § 2B1.1 at cmt. n.3(A)(i), (ii). The term definitively does *not* include pecuniary harm that actually materialized because harm of that nature constitutes "actual loss" under the same Guidelines commentary. *See id.* In other words, intended loss is an entirely different category of harm from that expressly covered by the text of § 2B1.1(b)(1). *See id.*

that the commentary is rendered plainly inconsistent with the text of § 2B1.1(b)(1). The Government has identified nothing in the structure, history or purpose of this guideline that supports such an expansive view of the term "loss." "Deference in [this] circumstance would permit the [Sentencing Commission], under the guise of interpreting a [Guideline], to create *de facto* a new [Guideline]." *See Kisor*, 139 S. Ct. at 2415. "*Auer* does not, and indeed could not, go that far." *See id*.

The Court recognizes that it, other district courts in this circuit, and the Eleventh Circuit Court of Appeals have routinely applied "intended loss" in past Guidelines calculations. *See, e.g.*, *United States v. Baldwin*, 774 F.3d 711, 727-28 (11th Cir. 2014); *United States v. Barrington*, 648 F.3d 1178, 1197-98 (11th Cir. 2011); *United States v. Fisher*, No. 3:19cr076, 2021 WL 1886000, at *1-2 (N.D. Fla. May 11, 2021); *Bah v. United States*, 2015 WL 5092569, at *2 (S.D. Ga. Aug. 27, 2015). In each case, the respective court fairly "reflexive[ly]" deferred to the Sentencing Commission's interpretation of loss under § 2B1.1(b)(1), which, again, includes harm that did not actually materialize. But none of the cases—nor any others cited by the Government or found by the Court—engaged in the *Kisor* process of exhausting the traditional tools of construction to conclude that § 2B1.1 was genuinely ambiguous before turning to the Commentary. *See Kisor*, 139 S. Ct. at 2415. Moreover, none of the cases cited by the Government (or any other) determined that the Sentencing Commission's definition of "intended loss" could

reasonably be read into any zone of ambiguity inherent in the term "loss." *See id*. at 2415-16.  Because these issues do not appear to have been squarely addressed or even raised in this circuit (or in the Supreme Court, for that matter), this Court is free to consider them on the merits.  *See United States v. Jackson*, 36 F.4th 1294, 1305 (11th Cir. 2022) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)) ("Questions which merely lurk in [a] record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

In light of *Kisor*'s clarifications on deference to administrative agencies and the Court's own careful consideration of the Guidelines and accompanying commentary, the undersigned concludes that "intended loss" does not "fall within the bounds of reasonable interpretation" for the term "loss" in § 2B1.1(b)(1).  The Court thus declines to defer to Application Note 3(A)(ii).  Accordingly, Alford's objection to the use of "intended loss" to determine his offense level under the Guidelines is **SUSTAINED**.

**SO ORDERED**, on this 20th day of August, 2022.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**