UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
                                )        Case No. 3:21cr52/MCR
                                )
vs.                             )        Pensacola, Florida
                                )        August 22, 2022
                                )        2:07 p.m.
                                )
STEPHEN M. ALFORD,              )
                                )
        Defendant.              )
_____)

TRANSCRIPT OF **SENTENCING** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-70)

FOR THE GOVERNMENT:          Jason R. Coody
                             Acting United States Attorney
                             By:  **DAVID L. GOLDBERG**
                                  Assistant U.S. Attorney
                                  *david.goldberg@usdoj.gov*
                             21 East Garden Street, Suite 400
                             Pensacola, Florida  32502

FOR THE DEFENDANT:           Randolph Murrell
                             Federal Public Defender
                             by:  **RANDALL LOCKHART**
                                  Assistant Public Defender
                                  *Randall_Lockhart@fd.org*
                             3 West Garden Street, Suite 200
                             Pensacola, Florida  32502

1                            P R O C E E D I N G S

01:59:43   2          *(Court called to order; Defendant present with counsel.)*

02:07:35   3          **THE COURT:**   Good afternoon.   Mr. Stephen Alford is

02:07:40   4   before the Court again for sentencing.   He's here with

02:07:43   5   Mr. Lockhart.   Mr. Goldberg is here representing the United

02:07:46   6   States along with Agent Smith.   Officer Pearce is here from

02:07:50   7   Probation.

02:07:50   8          Let me bring us up to date.   There was an outstanding

02:07:55   9   objection -- that was the reason the last sentencing was

02:07:59  10   continued -- objection by Mr. Alford and counsel under

02:08:03  11   Sentencing Guideline 2B1.1(b)(1).

02:08:07  12          I made a ruling on Saturday sustaining the objection.

02:08:12  13   Mr. Goldberg filed a motion to reconsider this morning.

02:08:16  14   Mr. Lockhart, you filed a response to the motion to reconsider.

02:08:19  15          I'm not going to grant the motion to reconsider, but

02:08:22  16   I'm going to vacate the order, and here is why.   I entered the

02:08:26  17   order on Saturday and then spent -- I won't say extraordinary

02:08:31  18   but a lot of time on Sunday reviewing the file, reviewing all

02:08:34  19   of the transcripts, going back through all of the evidentiary

02:08:39  20   record for this sentencing.   And the sentence that I'm going to

02:08:42  21   impose today is going to be the same sentence regardless of the

02:08:46  22   guideline objection or whichever guideline I use.

02:08:49  23          So I just don't think, given that, this is not the

02:08:52  24   case for that test, and so I'm going to vacate the order.

02:08:57  25          There are a couple of other judges on our court who

| | |
|---|---|
| 02:09:00 | 1 |

are considering the same issue, and like I said, given my

decision to impose right now, unless something changes in the

courtroom, my sentence is going to be the same.  So that's

where I stand, that's why I'm going to vacate the order without

granting the motion to reconsider.  The motion to reconsider

will be deemed moot.

In other words, I'm going to end up overruling the

objection.  I'm going to apply the guideline with the 20-level

increase, and then I'm going to vary.  And again, likely I'm

going to impose the same sentence I would if the guideline

objection had been sustained.  All right?

**MR. LOCKHART:**  I understand.

**THE COURT:**  So let's proceed then.

So the Presentence Report, as it stands with the

20-level increase, you know what the calculation is.  20-level

increase off of base offense level of 7.  Three levels for

status of the victim, 2 levels for obstruction.

I do understand there's still I believe an obstruction

objection, is that correct, Mr. Lockhart?

**MR. LOCKHART:**  That is, Your Honor.

**THE COURT:**  Three levels for acceptance.

Total offense level 29, Criminal History Category of

V.  The recommended range is 140 to 175 months.

So, Mr. Goldberg, with that, I understand you have an

objection to the 20-level increase.  I understand your

02:10:29  1    objection.  And frankly, just for both sides' benefit, my view

02:10:35  2    of the law -- while Mr. Goldberg makes some arguments, my view

02:10:41  3    of the law, I'm still persuaded that the guideline is not

02:10:51  4    ambiguous with the term "loss" and therefore we shouldn't turn

02:10:55  5    to the commentary.

02:10:57  6         With that said, I'm not entirely certain that the

02:11:00  7    Eleventh Circuit would agree with me on that in terms of their

02:11:03  8    prior precedent.  So, again, this is not the test case for

02:11:06  9    this.

02:11:07  10        **MR. LOCKHART:**  The only other thing I would point out

02:11:09  11   is I did have a separate objection just with regard to whether

02:11:12  12   the Court actually finds that Mr. Alford intended to

02:11:16  13   financially defraud anyone in this case.  Because, of course,

02:11:20  14   the case is about him making a promise that he could get a

02:11:24  15   presidential pardon.

02:11:26  16        We believe that the record is replete with evidence

02:11:30  17   that Mr. Alford did not intend to financially defraud anyone

02:11:32  18   even for a single dollar, and that would also render

02:11:35  19   essentially moot the Court's now vacated order if the Court

02:11:40  20   agreed with us on that.  And so I just wanted to point that out

02:11:43  21   as well.

02:11:44  22        **THE COURT:**  Well, I can hear that argument.  I'm not

02:11:47  23   going to preclude you from -- that's not the argument that I

02:11:50  24   addressed in my order.

02:11:52  25        **MR. LOCKHART:**  I understand that.

02:11:53   1          **THE COURT:**  So, if you still want to proceed with

02:11:55   2   that, I can hear that today.

02:11:57   3          **MR. LOCKHART:**  I would, Your Honor.  And we feel that

02:11:59   4   the record is just replete with evidence that Mr. Alford did

02:12:02   5   not intend to defraud Mr. Gaetz of $25 million.  We know that

02:12:10   6   because when we look at everything that's been submitted as

02:12:13   7   part of the record from Mr. Kent, which includes his 302s, his

02:12:19   8   supplement interviews after Mr. Alford's arrest, the letter

02:12:24   9   that he submitted to the Court on behalf of himself stating his

02:12:27  10   position in this case, what their purpose was, why they were

02:12:31  11   trying to go about rescuing Mr. Levinson.  We have the same

02:12:37  12   support from David McGee, a local attorney in town, who

02:12:41  13   essentially was subject to surveillance and basically conducted

02:12:46  14   a deposition, being recorded by the FBI and Don Gaetz in this

02:12:50  15   case where Mr. McGee goes into great detail about the history

02:12:56  16   of their efforts, meaning including Mr. Kent --

02:12:59  17          **THE COURT:**  But he still made a promise he couldn't

02:13:02  18   keep --

02:13:02  19          **MR. LOCKHART:**  Well, he did, Your Honor, but --

02:13:03  20          **THE COURT:**  -- in order to get money.

02:13:04  21          **MR. LOCKHART:**  That's right.  And so essentially he

02:13:06  22   oversold it, but that's separate and distinct from whether or

02:13:11  23   not he ever intended to defraud someone or not pay them back.

02:13:15  24          And the issue here with regard to intended loss, for

02:13:18  25   example, is whether or not --

02:13:19  1      **THE COURT:**  I think Mr. Alford even, in his recorded

02:13:24  2   conversation with Mr. Gaetz, I mean, he pretty much conceded he

02:13:29  3   wasn't going to be able to pay him back.

02:13:31  4      **MR. LOCKHART:**  Well, he did to a certain degree.  But

02:13:34  5   I think -- I would disagree with that in substance because

02:13:38  6   Mr. Alford certainly repeatedly referred Mr. Gaetz to Mr. McGee

02:13:43  7   to try to structure some legal document where Mr. Alford would

02:13:47  8   be bound legally for that amount of money.

02:13:49  9      And while I said in my objection that, to some extent

02:13:52  10  that position is ridiculous, it kind of also underscores the

02:13:57  11  fact that the victim here, Mr. Gaetz, would never have ever

02:14:00  12  believed that this was a legitimate proposal anyway.

02:14:04  13     **THE COURT:**  It seems to me that these are arguments

02:14:06  14  more appropriate under 3553(a), Mr. Lockhart.

02:14:10  15     **MR. LOCKHART:**  Well, I appreciate that, Your Honor,

02:14:12  16  and obviously you're the boss here.  The only thing I'm

02:14:15  17  pointing out, though, is that the evidence is replete that

02:14:19  18  Mr. Alford thought that, if this could be successful, that it

02:14:22  19  was genuine, and that if it was, he could rely on Mr. McGee and

02:14:26  20  other forces that would come into play.  Because the goodwill

02:14:29  21  of being successful in this project and releasing someone like

02:14:34  22  Mr. Levinson, who is the longest-held American captive abroad

02:14:39  23  in American history, would result in, as Mr. McGee put it in

02:14:44  24  what I'll call his deposition, movie deals, money, book rights,

02:14:48  25  interviews, all kinds of things.

| | | |
|---|---|---|
| 02:14:50 | 1 | And so, it all leads to Mr. Alford genuinely believing |
| 02:14:56 | 2 | that this is something that he could do.  And that's a |
| 02:14:58 | 3 | subjective belief.  We don't have to find that Mr. Alford |
| 02:15:01 | 4 | should have believed that, but that's genuinely what he did |
| 02:15:07 | 5 | believe. |
| 02:15:08 | 6 | **THE COURT:**  But he admitted -- we're here on a guilty |
| 02:15:11 | 7 | plea. |
| 02:15:11 | 8 | **MR. LOCKHART:**  He admitted making a false promise that |
| 02:15:14 | 9 | he couldn't guarantee a pardon.  I mean, that's exactly what he |
| 02:15:19 | 10 | pled to.  He didn't plea, though, to -- he didn't admit ever |
| 02:15:24 | 11 | trying to not pay Don Gaetz back if Don Gaetz had been foolish |
| 02:15:29 | 12 | enough to invest in this. |
| 02:15:31 | 13 | And so that's two separate and distinct things, and so |
| 02:15:32 | 14 | that's why it's relevant to 2B1.1.  He oversold it and said, |
| 02:15:38 | 15 | *Hey, I can get you a pardon*.  But at the end of the day, if |
| 02:15:42 | 16 | Mr. Alford went to Don Gaetz and basically made this same |
| 02:15:44 | 17 | proposal, but just instead of saying, *Hey, I can promise you* |
| 02:15:44 | 18 | *that I can get you in front of President Biden and get your son* |
| 02:15:48 | 19 | *a pardon,* if he had just said, *Well, I would do my best to be* |
| 02:15:52 | 20 | *able to do that*, we wouldn't be here.  Because what he's done |
| 02:15:56 | 21 | other than that is not illegal. |
| 02:15:58 | 22 | So it's a separate question as to whether or not |
| 02:16:00 | 23 | Mr. Alford -- if Mr. Alford genuinely believed that this |
| 02:16:03 | 24 | project was legitimate and had the ability to be successful, he |
| 02:16:06 | 25 | genuinely believed he could pay the money back, he just |

| | |
|---|---|
| 02:16:11 | 1 |

genuinely did.

02:16:12  2   **THE COURT:**  There's got to be an objective assessment

02:16:15  3  of that, though.  He can stand up all day long and say, *I*

02:16:21  4  *believed I one day would pay him back*, but there's got --

02:16:24  5   **MR. LOCKHART:**  Well, he could.  But when we look at

02:16:27  6  those that were around him like Dave McGee and bob Kent,

02:16:32  7  everyone around him including family members, his therapist,

02:16:37  8  everyone around him believed that he was so committed to this,

02:16:40  9  that he was taken up in it, that he thought that it was going

02:16:44  10  to be something that would be successful.  He looked at it as a

02:16:48  11  form of being able to potentially exonerate himself, his

02:16:52  12  reputation, obtain a pardon.

02:16:54  13   And it just doesn't make any sense that, as a separate

02:16:56  14  motivation, that he would try to defraud the Gaetz family of

02:17:01  15  money.  The objective was to get the money so that the project

02:17:02  16  could be successful, not to defraud the family and have the

02:17:04  17  project not be successful where he then doesn't get a pardon,

02:17:08  18  he's not able to do anything with regard to his reputation,

02:17:10  19  none of that.

02:17:11  20   **THE COURT:**  Well, I'm not sure why he pled guilty.  At

02:17:13  21  trial the government would have to prove a knowing intent to

02:17:17  22  defraud, and here you're telling me that he didn't knowingly

02:17:20  23  intend to defraud.

02:17:20  24   **MR. LOCKHART:**  Well, he pled guilty because he made a

02:17:23  25  promise to be able to secure a pardon from President Biden and

02:17:30  1   that that would be successful in exonerating his son who had

02:17:34  2   legal troubles at the time.

02:17:36  3          **THE COURT:**  Right.  But I didn't take Mr. Alford's

02:17:39  4   plea, I don't believe.  I suspect a magistrate judge did.  But

02:17:44  5   in going over the elements to the offense, he had to -- the

02:17:47  6   magistrate judge, she or he, whoever took his plea, would have

02:17:51  7   had to have found that he had a knowing intent to defraud.  And

02:17:53  8   based on --

02:17:54  9          **MR. LOCKHART:**  That's right.  And what I'm saying is

02:17:56  10  that the knowing intent to defraud is linked to and based on

02:18:00  11  Mr. Alford's assertions that he could absolutely guarantee a

02:18:03  12  pardon in exchange for an exchange of money with the Gaetz

02:18:07  13  family, which was at the time at the highest end $25 million.

02:18:12  14         And what I'm saying is is that it doesn't negate the

02:18:16  15  fact that there is substantial evidence to substantiate that he

02:18:20  16  intended on doing anything he could to try to pay that back,

02:18:22  17  and I'm saying that that's relevant to 2B1.1.

02:18:25  18         **THE COURT:**  I think it's relevant to the 3553(a)

02:18:26  19  factors.  I'm not sure I agree with you about the guideline.

02:18:30  20  But I'll hear from Mr. Goldberg, if he wishes to respond.

02:18:32  21         But let me hear your obstruction argument as well,

02:18:35  22  please.

02:18:36  23         **MR. LOCKHART:**  I appreciate that, Your Honor.

02:18:38  24         In terms of obstruction, it's my understanding that

02:18:40  25  both myself and the government, that we don't have a

02:18:42  1    disagreement with regard to the underlying facts of the case.

02:18:46  2    From our perspective, the issue is is whether or not

02:18:49  3    Mr. Alford's conduct resulted in any kind of substantial

02:18:51  4    disruption or interference with the government's investigation.

02:18:56  5         And when we look at the government's facts, what

02:18:59  6    they're essentially saying is that he appeared at the state

02:19:04  7    probation office around 5:00 p.m., at the time they intended to

02:19:08  8    serve a search warrant on him for both his person and his

02:19:13  9    vehicle.  But, as I understand it, they were actually looking

02:19:16  10   for his cell phone.

02:19:17  11        When he showed up at state probation on that date, he

02:19:21  12   didn't know the FBI would be there.  They hadn't told him in

02:19:25  13   advance, obviously, that he needed to bring his cell phone, and

02:19:28  14   he didn't have it on him.  And so at that time they didn't

02:19:32  15   serve him with a search warrant for the phone.

02:19:34  16        One was later obtained on 4/2 of '21, but the search

02:19:38  17   warrant is not -- there's no time indicated on it, so it's

02:19:42  18   difficult to know from the record exactly when the search

02:19:45  19   warrant was obtained.  But at that time, when those two search

02:19:49  20   warrants were served on Mr. Alford, he did not have the phone,

02:19:54  21   and he was allowed to leave.

02:19:56  22        The government has put forth essentially 302s that

02:20:01  23   substantiate from that point they basically gave overt

02:20:06  24   surveillance or gave overt chase to Mr. Alford where they

02:20:11  25   didn't try to hide that they were following him, and at this

02:20:14  1    point they state that he knew that they wanted his phone.  And

02:20:18  2    he went into a Tom Thumb and later to a Verizon.

02:20:22  3        And so we get to about seven o'clock where, in the

02:20:25  4    Verizon store, Mr. Alford went in to buy a replacement phone.

02:20:30  5    It's my understanding that at that time he was warned about

02:20:33  6    possible obstruction if he was going to, say, obtain a new

02:20:36  7    phone and call someone and have them destroy the phone that now

02:20:39  8    he knows the government is looking for or, if he were to do

02:20:43  9    something else that was going to put the phone and the

02:20:45  10   subsequent evidence from that phone at risk, that it could be

02:20:48  11   obstruction.

02:20:50  12       Fast-forward to -- from the Verizon store, he goes to

02:20:55  13   the hotel where he's living, which is Home2 Suites, and that's

02:20:59  14   at about 8:00 or 8:30, and at that point he's warned more

02:21:02  15   specifically about obstruction.  And he agrees immediately --

02:21:10  16   when he believes he's going to be arrested, that he starts

02:21:14  17   cooperating with the government, and he tells them that he'll

02:21:16  18   take them to where the phone is.

02:21:18  19       Earlier that day he had given the phone to a woman who

02:21:21  20   had worked for him for some period of time.  Her name is Carrie

02:21:26  21   Bair.  And he immediately drove, with FBI in tow, to her house

02:21:30  22   to retain the phone.

02:21:33  23       The 302s -- and I don't think the government disputes

02:21:36  24   this, it's referenced in their response.  He at one point --

02:21:39  25   the text records show that he's literally contacting or trying

02:21:44  1    to contact Carrie Bair while he's on the way to her residence.

02:21:44  2    He's not able to reach her.  He gets to the residence, he talks

02:21:51  3    to her husband --

02:21:51  4         THE COURT:  Why didn't he just do this from the

02:21:52  5    beginning?  Why lead the FBI on some wild goose chase for

02:21:57  6    hours?

02:21:57  7         MR. LOCKHART:  I understand that, Your Honor, and I

02:21:59  8    don't know.  But the point is is even that does not rise to the

02:22:04  9    level of obstruction.  It becomes inconvenience.  There's a

02:22:07  10   number of things that the government asserts that's more in

02:22:10  11   line in terms of sarcasm.

02:22:14  12        But even if we look at 3C1.1 and we look at note 5

02:22:19  13   with regard to what's not obstruction, even making false

02:22:22  14   statements that aren't under oath is not obstruction, even

02:22:25  15   fleeing from law enforcement is not obstruction.

02:22:28  16        Now, obviously, Mr. Alford did not flee from law

02:22:32  17   enforcement in this case.  I don't know why the PSR actually

02:22:34  18   said that.  He did not.  The government is not claiming that he

02:22:38  19   fled from law enforcement.  But as another example, even

02:22:42  20   providing incomplete or misleading information is not

02:22:45  21   obstruction.

02:22:46  22        We have to get to a point to where he provides

02:22:49  23   materially false statements to the police that significantly

02:22:54  24   obstruct or impede their investigation.

02:22:57  25        And while -- here is my whole point.  While he does

| | | |
|---|---|---|
| 02:23:02 | 1 | not cooperate with them between 5:00 p.m. and 8:30, and at 8:30 |
| 02:23:07 | 2 | when he starts to cooperate with them, he takes them to Carrie |
| 02:23:10 | 3 | Bair, unfortunately she wasn't home at the time.  She |
| 02:23:14 | 4 | ultimately didn't know what she had done with the phone.  They |
| 02:23:17 | 5 | eventually find it in her car.  They never leave her residence. |
| 02:23:22 | 6 | He's ultimately there the entire time.  They get the phone. |
| 02:23:26 | 7 | There is no evidence of any loss of evidence whatsoever. |
| 02:23:27 | 8 | Mr. Alford even allows the FBI to look at the phone |
| 02:23:30 | 9 | that he bought at Verizon that only shows that he was just |
| 02:23:34 | 10 | calling Carrie Bair to try to frantically get her to come to |
| 02:23:38 | 11 | the house and leave the phone on the front step or whatever it |
| 02:23:42 | 12 | is. |
| 02:23:42 | 13 | He basically switched into a cooperation mode at about |
| 02:23:46 | 14 | 8:30 when they confronted him again at his hotel, he went |
| 02:23:46 | 15 | directly to Ms. Bair's residence, and they stayed there with |
| 02:23:54 | 16 | FBI until the phone was retrieved.  So there wasn't destruction |
| 02:23:56 | 17 | of any evidence whatsoever.  And we also -- |
| 02:23:57 | 18 | **THE COURT:**  How is it not concealing for hours? |
| 02:24:02 | 19 | **MR. LOCKHART:**  I'm sorry? |
| 02:24:03 | 20 | **THE COURT:**  Concealing the evidence, why is not that? |
| 02:24:06 | 21 | **MR. LOCKHART:**  Well, just because it doesn't -- it |
| 02:24:10 | 22 | just doesn't show any kind of substantial obstruction or |
| 02:24:13 | 23 | impedance of their investigation.  It's a delay, but he never |
| 02:24:16 | 24 | impedes it. |
| 02:24:17 | 25 | And in fact, we know from the warrant that they got |

02:24:20  1    that they had the ability -- and they knew the phone was on,

02:24:24  2    they had apparently called the phone, and they had the ability

02:24:27  3    to ping the phone.

02:24:28  4        And there is Eleventh Circuit case law that basically

02:24:29  5    says that if the law has the ability to go and obtain something

02:24:33  6    that they otherwise -- there's more than one way to get at

02:24:37  7    something, the defendant is not in a position where he's

02:24:40  8    required to cooperate with law enforcement.

02:24:42  9        And so -- there is some question when Mr. Alford was

02:24:46  10   ultimately shown and advised that this warrant actually

02:24:49  11   existed.  Our position is that I certainly wish Mr. Alford had

02:24:53  12   complied.  But the fact that he didn't, the fact that he was

02:24:56  13   sarcastic, the fact that he was wasn't happy about the fact

02:25:00  14   that they were following him and wanted his phone, it's just

02:25:03  15   not obstruction.

02:25:04  16       And at the end of the day, they had a completely other

02:25:07  17   way to be able to retrieve the phone, which was to be able to

02:25:10  18   obtain a warrant, which they had, and ping it and geolocate it

02:25:13  19   and find it that way, which, where was it, it was in Carrie

02:25:18  20   Bair's car.

02:25:18  21       Now, it cost the FBI a few hours on a Friday

02:25:22  22   afternoon, and I understand that the FBI wasn't happy about

02:25:24  23   that.  But at the end of the day, the evidence was achieved,

02:25:28  24   there wasn't any significant obstruction or impairment of their

02:25:31  25   investigation.  They ultimately got the evidence and it was

02:25:34   1   complete.

02:25:34   2   And there was no attempt by Mr. Alford at any time to

02:25:36   3   erase, destroy, or otherwise prevent the FBI from being able to

02:25:41   4   get the evidence.  The extent of his alleged obstruction would

02:25:45   5   be just not telling them for about two-and-a-half hours where

02:25:48   6   it was, and that's where we end it, Your Honor.

02:25:54   7   **THE COURT:**  All right.  Were there any other guideline

02:25:56   8   objections?

02:25:57   9   **MR. LOCKHART:**  No, Your Honor.

02:25:58   10   **THE COURT:**  Thank you.

02:25:59   11   Mr. Goldberg, I'll hear from the government in

02:26:00   12   whatever order you wish to proceed.

02:26:03   13   **MR. GOLDBERG:**  Your Honor, as it relates to the

02:26:05   14   obstruction, right off the bat, the defense just argued

02:26:10   15   standards that aren't the standards here.

02:26:12   16   The government doesn't have to prove by a

02:26:14   17   preponderance of the evidence that there was a substantial

02:26:16   18   disruption, doesn't have to prove that there was a substantial

02:26:19   19   impediment.  And as noted in Document 41 in the government's

02:26:25   20   response to the objections, we're actually operating under

02:26:28   21   comment note 4(D), which is just attempt to conceal.  Material

02:26:33   22   false statements is a separate commentary or application note.

02:26:36   23   All the government had to prove by a preponderance of

02:26:40   24   the evidence for the obstruction enhancement is an attempt to

02:26:42   25   conceal material evidence, which, as the Court intimated, is

02:26:46  1   what happened here during five hours driving around and around

02:26:50  2   and around, lying to FBI agents.  It's the defendant's attempt

02:26:53  3   to conceal evidence, and that's what he was attempting to do.

02:26:56  4   It's pretty straightforward.

02:26:57  5          The defense has relied on burdens or standards that

02:27:01  6   are not articulated in that application note.  It's 4(D).

02:27:07  7          **THE COURT:**  One second.  I'm there, I'm sorry, I was

02:27:10  8   just reading one section of it.

02:27:18  9          Well, based on the facts, I agree with the government,

02:27:22  10  and there is not a requirement in the guideline in the

02:27:30  11  commentary to the guideline under 4(D) for requiring a finding

02:27:36  12  of significant obstruction or impedance to the official

02:27:41  13  investigation.

02:27:42  14         And I do find that this was an attempt to conceal.  It

02:27:46  15  went on for several hours, and at some point during that time

02:27:51  16  frame Mr. Alford knew there were search warrants for his phone.

02:27:53  17         Mr. Lockhart?

02:27:54  18         **MR. LOCKHART:**  Can I respond to that just most

02:27:57  19  briefly, Your Honor?

02:27:58  20         **THE COURT:**  Okay.

02:27:59  21         **MR. LOCKHART:**  4(D) requires that there be a material

02:28:02  22  hindrance of the government's investigation.

02:28:04  23         **THE COURT:**  I don't know that it does.  It says, "If

02:28:10  24  such conduct occurred contemporaneously with arrest, it shall

02:28:15  25  not standing alone be sufficient to warrant an adjustment for

02:28:18   1   obstruction unless it resulted in a material hindrance."

02:28:23   2         **MR. LOCKHART:**  Yes.

02:28:24   3         **THE COURT:**  Well, this wasn't in connection with his

02:28:26   4   arrest.

02:28:26   5         **MR. LOCKHART:**  Well, it certainly was, in the sense

02:28:29   6   that they were threatening to arrest him if he didn't comply.

02:28:34   7         **THE COURT:**  Well, I don't think that's what this

02:28:35   8   contemplates.  So I hear you, but the objection is overruled.

02:28:37   9         **MR. GOLDBERG:**  Your Honor, very briefly, as it relates

02:28:40   10  to the initial assertion by the defense, I'll keep it extremely

02:28:45   11  brief because I think the Court is right, it's a 3553(a)

02:28:47   12  consideration and our guideline consideration regarding

02:28:53   13  intended affliction of harm.

02:28:55   14        It is the government's position the defense is, as

02:28:56   15  articulated in Document 41, conflating issues.  As written by

02:29:02   16  the government in Document 41, "The defendant is conflating the

02:29:03   17  issues as to what the victim, Mr. Gaetz, Senator Gaetz would

02:29:07   18  have actually been paying for, a pardon or vindication for his

02:29:12   19  son versus hostage retrieval."

02:29:14   20        As articulated in PSR paragraph 18, the first thing

02:29:19   21  this defendant says in reaching out to the victim is not *Let's*

02:29:22   22  *go save an American hero*, it's not *Let's raise money for*

02:29:27   23  *America*.  The first thing is:  *I would like to talk with you*

02:29:31   24  *immediately about the current federal investigation and*

02:29:36   25  *indictment that is about to be filed against your son*.

02:29:44  1          PSR paragraph 27(b):  "I need a million dollars in

02:29:52  2  cash and four-and-a-half million to Beggs & Lane."

02:29:57  3          Well, we can't truly believe that part of saving

02:30:01  4  Mr. Levinson would be a million dollars in cash handed off to

02:30:05  5  Mr. Alford, can we?  Of course, not.

02:30:07  6          **THE COURT:**  Well, actually, I saw this, but there are

02:30:10  7  other places in the record regarding -- because I do want to

02:30:14  8  talk to you about this, this may or may not be the appropriate

02:30:18  9  time but I guess I'll make it the appropriate time -- in

02:30:22  10  regards to the amount that was actually sought in terms of the

02:30:28  11  fraud and the amount of money sought from Mr. Gaetz.

02:30:32  12          The PSR references $25 million, and that's always what

02:30:36  13  I thought it was.  And then, as I delved deeper into the actual

02:30:42  14  recordings, the audio recordings, particularly the one -- well,

02:30:47  15  I guess most specifically the one between Mr. Alford and

02:30:52  16  Mr. Gaetz, Mr. Alford makes it clear that it's not $25 million,

02:30:56  17  it's 15-and-a-half million.

02:31:00  18          **MR. GOLDBERG:**  That's in the PSR, Your Honor.

02:31:01  19          **THE COURT:**  I didn't see it in the PSR.  Mr. Pearce

02:31:04  20  and I discussed that.

02:31:05  21          **MR. GOLDBERG:**  The initial part of the scheme was

02:31:08  22  $25 million.  And then when he doesn't get the $25 million, he

02:31:11  23  lowers the price.

02:31:12  24          **THE COURT:**  Well, I think he lowered the price,

02:31:14  25  Mr. Goldberg, the first time he talked to Mr. Gaetz.  The prior

02:31:17  1   discussions were with Mr. Kent; is that not right?  Actually,

02:31:24  2   the first contact with Mr. Gaetz came from Mr. Kent.

02:31:28  3          MR. GOLDBERG:  The first salva was with Mr. Kent --

02:31:28  4          THE COURT:  Right.

02:31:34  5          MR. GOLDBERG:  -- on behalf of Mr. Alford.

02:31:35  6          THE COURT:  I don't know that I agree with that

02:31:36  7   characterization.

02:31:38  8          MR. GOLDBERG:  Well, respectfully, it's in the record

02:31:39  9   that Mr. Kent made contact at Mr. Alford's behest.

02:31:43  10         THE COURT:  Again, I'm not sure I agree with that

02:31:45  11  characterization.  It appeared to me that they both reached

02:31:53  12  out, and there are references to this and numerous references

02:31:56  13  to they, they, they, they, they, "they" meaning Mr. Kent and

02:32:01  14  Mr. Alford.

02:32:01  15         But what I'm referring to is, again, the discussion

02:32:05  16  between Mr. Alford and Mr. Gaetz that's recorded, "We told you

02:32:15  17  it would take $25 million," and then he said, "I've now

02:32:18  18  negotiated down to 15.5.  I need 5.5 up front which David"

02:32:24  19  meaning McGee "will manage, and then $10 million after I get

02:32:28  20  the proof of life video."

02:32:30  21         And then he says again, "No, I'm here today" -- this

02:32:36  22  is the same meeting, I believe -- "I'm here today" -- and by

02:32:40  23  the way, this is in Defendant's Exhibit No. 11, it is the --

02:32:51  24  make sure I have the date right -- it is the transcript -- the

02:32:57  25  transcript of the audio recording, to be more specific, from

02:33:01  1    4/6/21.

02:33:03  2             On page 10:  "I'm here today to ask for 15.5, 5.5 up

02:33:11  3    front, $10 million on the back.  And then when I show you the

02:33:14  4    proof of life and I say, Don, we've got to go get him, you can

02:33:18  5    either say I'll give you the 10 or I'll take it as this is

02:33:21  6    yours and Matt's deal.  Or if you say, Stephen, I'm good with

02:33:25  7    the 5.5, I still want big credit but go get your 10 somewhere

02:33:31  8    else, with that video I can get 10 somewhere else.  The problem

02:33:36  9    is I can't get 5.5 from anybody else right now."

02:33:40  10            And then farther down the page Alford says:  "I do

02:33:42  11   need a million in cash and I need 4.5 million in Dave McGee's

02:33:47  12   trust account."  And then Mr. Gaetz says, "So the cash would go

02:33:49  13   to you and the 4.5" -- I think Alford must interrupted him and

02:33:56  14   said "I'll send it all to David."

02:33:58  15            And then that's consistent with what Mr. McGee said as

02:34:01  16   well.  I don't see that there was a million dollars going to

02:34:08  17   Stephen Alford ever.  It was all going into Dave McGee's trust

02:34:12  18   account.  And like I said, I'm at page 10, and it says "I would

02:34:17  19   send it all to David."

02:34:19  20            **MR. GOLDBERG:**  May I have the Court's indulgence?

02:34:21  21            **THE COURT:**  Yes.

02:34:26  22            **MR. GOLDBERG:**  On page 6 of the Factual Basis for the

02:34:29  23   Guilty Plea, which is Document 32, which the defendant swore is

02:34:36  24   accurate, during the meeting between Mr. Gaetz and

02:34:41  25   Mr. Alford -- it's also articulated in Document 42 --

| | | |
|---|---|---|
| 02:34:48 | 1 | **THE COURT:**  Now you're confusing me.  You've got to |
| 02:34:51 | 2 | stick with one and then go to the other. |
| 02:34:54 | 3 | **MR. GOLDBERG:**  It's the same thing, Your Honor. |
| 02:34:55 | 4 | **THE COURT:**  Well, just give me one document number. |
| 02:34:57 | 5 | **MR. GOLDBERG:**  Document 42, paragraph 27. |
| 02:34:59 | 6 | **THE COURT:**  This is the factual basis? |
| 02:35:01 | 7 | **MR. GOLDBERG:**  This is actually the final PSR, but it |
| 02:35:06 | 8 | does appear in the factual basis as well. |
| 02:35:12 | 9 | **THE COURT:**  Well, you started with the factual basis |
| 02:35:14 | 10 | so that's where I went.  Where are you in the PSR? |
| 02:35:17 | 11 | **MR. GOLDBERG:**  Document 42, paragraph 27, subsection |
| 02:35:28 | 12 | (b).  The following statements were made by Alford during the |
| 02:35:30 | 13 | meeting with regard to the money: |
| 02:35:32 | 14 | "I need a million dollars in cash and four-and-a-half |
| 02:35:38 | 15 | million in attorney A's hands that he will disburse as we tell |
| 02:35:42 | 16 | him to do." |
| 02:35:43 | 17 | Those are two distinct pots of money. |
| 02:35:45 | 18 | **THE COURT:**  I see that.  But the record reflects |
| 02:35:47 | 19 | differently.  I'm just telling you what I'm reading in the |
| 02:35:51 | 20 | evidentiary record, and it is that all of it was going into |
| 02:35:54 | 21 | Dave McGee's trust account. |
| 02:35:56 | 22 | And, okay, maybe this is how the PSR reflects it, but |
| 02:36:02 | 23 | that's not how the record reflects it. |
| 02:36:04 | 24 | **MR. GOLDBERG:**  It's also how the factual basis |
| 02:36:06 | 25 | reflects it.  So that transcript may not be perfectly accurate. |

02:36:09   1    I just don't know the answer to that.  All I can tell you --

02:36:12   2           **THE COURT:**  Well, I rely on the transcripts.  I don't

02:36:15   3    think --

02:36:15   4           Mr. Lockhart, did you transcribe these?

02:36:18   5           **MR. LOCKHART:**  No, Your Honor.

02:36:20   6           **MR. GOLDBERG:**  All I can tell you is what's in

02:36:23   7    Document 32 and Document 42.

02:36:27   8           **THE COURT:**  So I have that, and then I have from

02:36:32   9    Mr. McGee -- Mr. McGee says to Mr. Gaetz -- this is in

02:36:47   10   Defendant's Exhibit 9, a transcript of -- it says interview,

02:36:50   11   but it's an audio recording from March 26th between Mr. Gaetz

02:36:57   12   and Mr. McGee.  I believe Mr. Gaetz maybe had a wire.

02:37:04   13          And Mr. Gaetz says:  "A guy named Robert Kent

02:37:09   14   contacted me out of the blue" -- this is on page 4 -- "and told

02:37:14   15   me that -- well, his opener was that he knew there was a

02:37:17   16   federal investigation of my son" -- we know who that is -- "and

02:37:20   17   that he had a way to make it go away."  That's what Mr. Gaetz

02:37:27   18   tells Mr. McGee.

02:37:30   19          **MR. GOLDBERG:**  And I understand Your Honor is reading

02:37:32   20   from the transcript.

02:37:34   21          **THE COURT:**  I'm reading from the transcript.  If you

02:37:37   22   have a transcript that's transcribed differently, I would be

02:37:39   23   happy to see it.

02:37:40   24          **MR. GOLDBERG:**  Well, I'm looking at quotes now, and I

02:37:43   25   apologize profusely.  Again, from Document 32, this will be the

02:37:48  1   factual basis, and I'm trying to marry it up with the

02:37:52  2   transcript the Court is reading from.

02:37:53  3        Document 32, pages 7 to 8, these are quotes that the

02:37:56  4   defendant agreed to:  "I just need a million dollars and 4.5 at

02:38:01  5   my disposal."

02:38:03  6        **THE COURT:**  Well, again, speaking to that, on page 13

02:38:06  7   of the same transcript, Mr. McGee, whose trust account we're

02:38:10  8   talking about, says:  "Yes, we would put it in a trust account.

02:38:13  9   If we thought it was really going -- something like that was in

02:38:17  10  prospect, you could put it in my trust account here and it

02:38:21  11  wouldn't be distributed without your permission.  And on that

02:38:25  12  permission it would require Mr. Levinson to be free and outside

02:38:28  13  of Iran."

02:38:30  14       And then Mr. McGee says:  "If we're going do it, I'd

02:38:33  15  prefer that you and I work out the money ends of it."  And

02:38:36  16  Mr. Gaetz says:  "Yeah, I'd rather work with you on that than

02:38:40  17  work with the two guys that I really necessarily don't know."

02:38:43  18       Who drafted the factual statement?  Your office?

02:38:49  19       **MR. GOLDBERG:**  Yes, Your Honor.  That's -- there are

02:38:51  20  quotes in there.  I'm not suggesting the transcript is

02:38:53  21  inaccurate.  I'm just trying to marry it up to the --

02:38:56  22       **THE COURT:**  Well, I'm just reading from it.

02:38:58  23       **MR. GOLDBERG:**  The quotes in the factual basis come

02:39:01  24  from the transcript.

02:39:02  25       **THE COURT:**  Well, if that's the case, then the

02:39:05  1   transcript says two different things on these two issues --

02:39:12  2   couple of issues, one having to do with the money.

02:39:17  3          MR. GOLDBERG:  I'm not sure they say different things

02:39:22  4   as they could be interpreted as different things.  Because when

02:39:24  5   they talk about wire transfers that's going to the law firm, it

02:39:27  6   appears that the government is interpreting something different

02:39:29  7   than the Court, which is handing cash to Mr. Alford is

02:39:31  8   different than wiring money to Beggs & Lane.  There's a

02:39:34  9   distinction there, in the government's eyes.

02:39:38  10          THE COURT:  All right.

02:39:42  11          MR. GOLDBERG:  I'm sure the Court can appreciate why

02:39:44  12   the government doesn't think that Mr. Alford is a trustworthy

02:39:48  13   custodian of a million dollars in cash, and we think it is

02:39:53  14   distinct from wiring millions of dollars to Beggs & Lane.  I do

02:39:57  15   think that is a reasonable review of the record.

02:40:00  16          I don't dispute the Court's discussion about a

02:40:03  17   significant amount of money going to Beggs & Lane.  But when

02:40:06  18   the defendant says he needs cash at his disposal, I do think

02:40:10  19   that's a 3553(a) factor and distinction.

02:40:14  20          THE COURT:  Okay.  So we'll move on to 3553(a) in just

02:40:18  21   a bit.

02:40:20  22          Mr. Lockhart, I'm going to overrule the guideline

02:40:24  23   objection.  I'll hear from you regarding 3553(a) factors on

02:40:26  24   these issues and any other that you want me to consider.  But

02:40:29  25   as far as the guideline objection, it's overruled.

| | |
|---|---|
| 02:40:31 | 1 |
| 02:40:32 | 2 |
| 02:40:32 | 3 |
| 02:40:39 | 4 |
| 02:40:43 | 5 |
| 02:40:48 | 6 |
| 02:40:52 | 7 |
| 02:40:54 | 8 |
| 02:40:57 | 9 |
| 02:41:01 | 10 |
| 02:41:06 | 11 |
| 02:41:11 | 12 |
| 02:41:15 | 13 |
| 02:41:19 | 14 |
| 02:41:23 | 15 |
| 02:41:27 | 16 |
| 02:41:32 | 17 |
| 02:41:36 | 18 |
| 02:41:41 | 19 |
| 02:41:45 | 20 |
| 02:41:50 | 21 |
| 02:41:56 | 22 |
| 02:42:00 | 23 |
| 02:42:00 | 24 |
| 02:42:05 | 25 |

**MR. LOCKHART:**  I understand that.  Thank you, Your Honor.

What's in evidence here, obviously, is that we have a legitimate project here.  I don't know that the government will agree with that, but I think the evidence overwhelmingly shows that this project to rescue Mr. Levinson was completely legitimate.  The only thing it lacked was funding.

And why we're here is because Mr. Alford was involved, in part, to try to obtain funding -- a substantial amount of money from an individual or individuals so that this project could be put into play and reach the objectives of all three -- at least the three players involved, which would include certainly Mr. Kent and Mr. Alford, but also even Mr. McGee.

And what we know is that -- I don't think there can be any doubt that the project was legitimate.  We know from the history of Bob Kent, we know from all of his interviews, we know of the opinions of Mr. McGee, who has been the attorney for the Levinson family for 20-plus years, they have even dealt with the State Department, they've met with multiple heads high in the U.S. Government and the different intelligence agencies.  They've -- Bob Kent has even been hired in the not-too-distant past to free Levinson and was paid by the U.S. Government to do so.

Dave McGee, I would submit, and the government won't disagree with this either, I think has impeccable credibility

02:42:08  1    with regard to this.  He is so close to the Levinson tragedy

02:42:13  2    that he would not participate in something that was a sham.

02:42:16  3    And not only that, he basically vouches for Bob Kent.

02:42:22  4          If Bob Kent is deemed to be incredible on any way with

02:42:29  5    regard to his network, as I understand it, the government

02:42:30  6    hasn't put forth anything to show that Bob Kent's network of

02:42:31  7    Middle East contacts and his ability to be able to free

02:42:34  8    Levinson this time or at any time in the past was fraudulent or

02:42:41  9    made up or even exaggerated at any point in time.

02:42:46  10         And I would submit that the interviews that we've put

02:42:48  11   on record of Bob Kent talking on Smerconish and other talk

02:42:56  12   shows fully substantiate what his intent here was, and the 302s

02:43:02  13   of Bob Kent by the FBI are in that same direction.

02:43:03  14         So what we have here is that Mr. Alford, who began to

02:43:06  15   have regular contacts with Mr. McGee once Mr. Alford got out of

02:43:10  16   state prison I think sometime in early 2020, learned a lot

02:43:14  17   about this project.  That's how he met Bob Kent.  And

02:43:17  18   Mr. Alford got very interested in it.

02:43:20  19         And being around Bob Kent and Dave McGee, it was very

02:43:24  20   exciting for Mr. Alford because he for the first time felt that

02:43:28  21   he was working on something that really was good and that it

02:43:30  22   could achieve something that was very important and that it

02:43:33  23   could help him restore his relationship not only in the

02:43:36  24   community but with regard to his family, and he genuinely

02:43:40  25   believed that it was true.

02:43:41    1          Now, Mr. Alford went about things in a manner that's

02:43:46    2    not obviously advisable.  He approached Mr. Gaetz and he made a

02:43:52    3    lot of wild assertions.  Mr. Gaetz is on record as saying that

02:43:56    4    he had seen or known of Mr. Alford in the past and wouldn't

02:43:59    5    have given him $5.  He tells -- Mr. Gaetz ultimately tells Dave

02:44:05    6    McGee at one point "I wouldn't give him $5 much less $5

02:44:12    7    million," or something along those lines.

02:44:14    8          And so this never had any real possibilities of

02:44:17    9    achieving any kind of funding in this case, but that's not

02:44:20   10    because Mr. Alford didn't believe that it had real promise.

02:44:24   11    And Mr. Alford had listened to Mr. McGee and Mr. Kent when they

02:44:28   12    talked about what the windfall would be if this could actually

02:44:33   13    be done, literally rescuing someone who was held in foreign

02:44:38   14    custody in the state of Iran, the longest-serving American

02:44:43   15    hostage abroad in American history and what this would

02:44:46   16    ultimately do.

02:44:48   17          And we know from the recordings between Mr. Alford and

02:44:54   18    Mr. Gaetz that Mr. Alford genuinely believed in that.  We know

02:44:59   19    that, too, from the letter from Bob Kent.  We know that, too,

02:45:02   20    from the letter from Mr. McGee, who indicated that Mr. Alford

02:45:06   21    is genuine here.

02:45:08   22          He literally says -- Mr. McGee literally says to Don

02:45:13   23    Gaetz on multiple occasions, *Look, you've got to be careful*

02:45:16   24    *about Mr. Alford, but I really think he's genuine here, he's*

02:45:20   25    *trying to do something that's good, that's decent, he's trying*

02:45:23   1   *to be a hero, he wants to restore himself in the eyes of his*

02:45:27   2   *family.*  And he even says that in the letter that we have

02:45:31   3   that's in front of the Court right now.

02:45:32   4          We know from the statements that Mr. Alford made

02:45:34   5   directly to Don Gaetz where he talks about, *I want a pardon out*

02:45:39   6   *of this, too.*  I mean, he was self-interested to try to be able

02:45:43   7   to ride the success of this because he felt that it was so

02:45:46   8   important.

02:45:46   9          And so everyone around Mr. Alford and everyone that

02:45:48   10  was closely tied with this project has opined at length about

02:45:53   11  what they were trying to do and the fact that it was a

02:45:55   12  legitimate project, and there's nothing in the record that says

02:45:59   13  it wasn't.  And I think that's very important.  Mr. Alford

02:46:01   14  believed that it was a legitimate project for all of those same

02:46:05   15  reasons.

02:46:06   16          And we literally have --

02:46:08   17          **THE COURT:**  Why did he need a million dollars in his

02:46:11   18  pocket then?

02:46:13   19          **MR. LOCKHART:**  Well, I don't believe that that -- I

02:46:15   20  don't read it that way, and I don't see a difference between

02:46:18   21  the factual basis and the transcript from this standpoint.

02:46:23   22          He entered a plea of guilty because he acknowledged

02:46:25   23  guilt in relationship to making promises in exchange for money.

02:46:30   24  So he lied, in essence, to be able to obtain money from Don

02:46:35   25  Gaetz, but that doesn't equate to money necessarily going into

02:46:38   1   Stephen Alford's pocket.  It was to get the money for a purpose

02:46:44   2   that was, in part, was misrepresented, but it doesn't mean that

02:46:46   3   the money that Mr. Alford was going to get wasn't ever in any

02:46:49   4   way going to go to him directly.

02:46:51   5        And we know that from Bob Kent, whose own letter

02:46:55   6   basically says, *Look, I asked for $25 million because that was*

02:46:58   7   *what was known by the IRGC and Levinson's captors, and we*

02:47:03   8   *needed that had kind of money because there were U.S. awards*

02:47:06   9   *that were on record for the rescue and capture* -- or I can't

02:47:10   10  say "capture" but I guess -- *the repatriation of Mr. Levinson*

02:47:15   11  *to the tune of about $20- to $25 million.*  So Bob Kent had

02:47:21   12  always said that's the amount of money that's always going to

02:47:24   13  be needed to be able to get him out because his captors know

02:47:24   14  what the U.S. government is willing to pay to free him.

02:47:28   15       And so the money, at all times, was going to go to

02:47:31   16  Dave McGee, and we know that because, when we look at what I'm

02:47:35   17  calling Dave McGee's deposition, he talks about that with Don

02:47:40   18  Gaetz over and over and over, and he talks about him having to

02:47:42   19  be careful about Mr. Alford but that his motivations are there,

02:47:46   20  that this is really a legitimate project, he talks at length

02:47:49   21  about what he knows about Bob Kent, what Bob Kent's history is

02:47:53   22  with the American government in relationship to his

02:47:56   23  intelligence network, the fact that Bob Kent had been hired

02:47:59   24  previously as an intelligence analyst and someone who the

02:48:02   25  American government believed had the ability to rescue Levinson

02:48:06    1    just five years, roughly, prior, and he goes on and essentially

02:48:10    2    says, *Look, we have the ability to do this, and the way to do*

02:48:14    3    *this would be for, if you want to invest, there's no*

02:48:18    4    *guarantees, you know what the risks are and here I'm telling*

02:48:21    5    *you what the risks are, but if you were to decide to invest,*

02:48:25    6    *this is how we would do it.* And it's literally on record, it's

02:48:28    7    on the transcript.

02:48:29    8    There's no indication whatsoever that Mr. Alford was

02:48:32    9    going to pocket any kind of money.  And even hypothetically if

02:48:36    10    that were the case, what evidence do we have that would have

02:48:39    11    shown that that would have ever happened?

02:48:42    12    Because here is the key point:  The main reason why

02:48:46    13    Mr. McGee was even, frankly, surveilled or deposed in secret

02:48:52    14    was because it was Mr. Alford that kept referring Don Gaetz to

02:48:57    15    Mr. McGee over and over and over and over.  And so, that's why

02:49:01    16    they ultimately wanted to talk to Mr. McGee, they wanted to see

02:49:05    17    what his role was.

02:49:07    18    Initially the case was being investigated because they

02:49:10    19    wondered whether or not there was an extortion scheme.  And the

02:49:13    20    Gaetz family has talked at great length about how this is an

02:49:18    21    extortion case, and the U.S. Attorney's Office will even say

02:49:22    22    that it's not an extortion case.

02:49:23    23    But the point is is, when we look at Don Gaetz's

02:49:26    24    depo -- his surveillance deposition, so to speak, with

02:49:29    25    Mr. McGee, he tells Mr. McGee, you know, *Boy, Mr. Alford sure*

02:49:33  1  *talks highly of you, and every time I talk to Mr. Alford he*

02:49:37  2  *says I've got to talk to Mr. McGee, and so I'm here to talk to*

02:49:41  3  *you.*

02:49:42  4          And so that's why in our sentencing memo we've pointed

02:49:45  5  out that, by referring Mr. Gaetz, the victim in this case, to

02:49:49  6  Dave McGee, it essentially mitigated the risk substantially, if

02:49:54  7  not entirely, because we literally have a surveillance

02:49:59  8  recording where Don Gaetz is talking to Dave McGee, and they

02:50:03  9  talk for several hours, and by the time they're done David

02:50:07  10  McGee has covered all points of Mr. Alford's personality, all

02:50:13  11  points of the project, all points of Bob Kent, and all points

02:50:20  12  of how they would structure this with regard to the money, and

02:50:23  13  they even talk about the legal pitfalls associating with doing

02:50:26  14  so.

02:50:27  15          And that ultimately is segued by the FBI and Don Gaetz

02:50:34  16  because they literally used that to say, *Okay, well, now I can*

02:50:38  17  *see that this could potentially be done,* and they try to

02:50:40  18  continue the investigation.  Of course, it gets thwarted when

02:50:44  19  Matt Gaetz goes on Tucker Carlson and the FBI's investigation

02:50:50  20  is shattered and it stops.  But that's a side issue.

02:50:51  21          But nonetheless, what we see here on the record, and

02:50:53  22  it's incontrovertible, is that Mr. Alford repeatedly referred

02:50:58  23  Mr. Gaetz to Dave McGee.  And Mr. Alford had been dealing with

02:51:04  24  Dave McGee since he had gotten out of state custody, and so

02:51:08  25  Dave McGee was essentially, in Mr. Alford's eyes, his go-to,

02:51:12   1   all-purpose attorney.

02:51:14   2          And we see that repeatedly from Mr. Alford when he

02:51:18   3   talks to Don Gaetz where he says, look -- he basically says,

02:51:22   4   *Look, I'm not a lawyer, but we can structure this any way we*

02:51:27   5   *possibly can, but he would know how to do it, you need to talk*

02:51:30   6   *to him.*

02:51:31   7          And at one point Mr. Alford even concedes to Don Gaetz

02:51:37   8   that he knows that Don Gaetz is a lawyer and -- Mr. Alford

02:51:40   9   essentially says, *Look, you know, you two are operating at a*

02:51:44   10  *higher level than I am, but this project is legitimate, we*

02:51:47   11  *think that we can really get Levinson out, and you need to talk*

02:51:50   12  *to Dave McGee about all of this.*  And that's when Don Gaetz

02:51:55   13  essentially says, *Well, I'm not a lawyer.*  And so it

02:51:59   14  substantiates that even Mr. Alford thought that this is

02:52:01   15  something that needed to be negotiated between Mr. McGee and

02:52:06   16  Mr. Gaetz.  And, you know, Mr. Alford defers to Mr. Gaetz and

02:52:15   17  his ability to communicate with Mr. McGee throughout their

02:52:18   18  communications.

02:52:19   19         And so, at the end of the day, Your Honor, we know

02:52:22   20  that this project was legitimate.  It wasn't just crafted to be

02:52:27   21  able to pitch to innocent victims and deprive them of money.

02:52:32   22         We know what Mr. Alford's relationship was with Bob

02:52:39   23  Kent and Mr. McGee.  Why?  Because they wrote detailed letters

02:52:44   24  explaining what that is.

02:52:45   25         We also know just from the people that are around

| | |
|---|---|
| 02:52:48 | 1 |
| 02:52:51 | 2 |
| 02:52:54 | 3 |
| 02:53:00 | 4 |
| 02:53:02 | 5 |
| 02:53:07 | 6 |
| 02:53:08 | 7 |
| 02:53:10 | 8 |
| 02:53:14 | 9 |
| 02:53:16 | 10 |
| 02:53:19 | 11 |
| 02:53:22 | 12 |
| 02:53:28 | 13 |
| 02:53:31 | 14 |
| 02:53:35 | 15 |
| 02:53:37 | 16 |
| 02:53:39 | 17 |
| 02:53:41 | 18 |
| 02:53:46 | 19 |
| 02:53:49 | 20 |
| 02:53:54 | 21 |
| 02:53:58 | 22 |
| 02:54:03 | 23 |
| 02:54:03 | 24 |
| 02:54:07 | 25 |

Mr. Alford that he was very excited about this project and that he felt that this was something that was legitimate.  And we know that from not only Mr. McGee and Mr. Kent's letters but we know it from -- Mr. Alford at the time was seeing a counselor named Linda Bolt and she talked about that; Betty Warfield, which is another letter we submitted, talked about that; and even his children had picked up on the fact that he was doing this because he felt that it had the ability to restore his reputation in the community.

And while that may seem ridiculous, that's what we have all of these people around Mr. Alford saying, and these are credible people.  Mr. Alford thought that, if this was something that he could pull off, that he would be deemed to be a hero, and that's literally the word that Dave McGee uses in his letter to the Court.

**THE COURT:**  Letter to the Court or to you?

**MR. LOCKHART:**  Well, to me that I submitted to the Court, to be fair and completely accurate, Your Honor.

And that's said multiple times, and that's also the description that Dave McGee gave Mr. Gaetz when they had their surveilled multi-hour-long interview, where he said, *Look, they want to be heroes, this is something that they want.  Mr. Kent wants this because he believes that he got very close to being able to extricate Mr. Levinson in the past and got so close but it was thwarted and we think it was done by the federal*

*government in terms of the state department or another agency,*

*and this is why we can't use the government again, this is why*

*we have to have private funding, but this project is in place.*

*I can't guarantee that it will be successful.  It has tons of*

*risks.  This is a lot of money.  You'd have to be very careful*

*with how you do that.*

And so, by Mr. Alford repeatedly referring Mr. Gaetz to Mr. McGee, it mitigates the risk in this case.

Now, obviously, Mr. Gaetz has said and has even said in his Victim Impact Statement that he had no intention of giving Mr. Alford $5, so we know that.  So that's all obviously relevant.

But even if that was not the case, there can be no question that, by the time Mr. Gaetz finished talking with Dave McGee, it was very, very, very clear what the risks were, what the pluses and minuses of the project were, what the pluses and minuses of Mr. Alford's character were, and how the money would have to be structured for this to be done.

And it was underscored over and over and over by Dave McGee that it would be a high risk proposition, but that, even if Mr. McGee were to assist, that he could do it such that, if the money was put up and Levinson wasn't released, there would be no expenditure of money whatsoever, in other words, it wouldn't be released out of his trust fund account.

And so Mr. McGee made it very clear to Mr. Gaetz that

the money was going to be coming to him, and frankly, that's the only way the project would have been done.

Now, obviously, Mr. Gaetz had no intention of investing, we know that.  He was just working for the federal government.  But let's say that he hadn't.  It's very clear that at that point those two had established a relationship such that, if there had been any investment, it would have been done through Mr. McGee, and it would have been done in the proper way, and it would have been -- to credit Mr. McGee's representations, it would have been done in an IOLTA or a trust account, and there would have been no expenditure of funds whatsoever, not even a single dollar, unless and until Levinson was released with proof.

So, at the end of the day, that also, we submit, supports a variance.  But from 3553(a) perspective, this is also why Mr. Alford genuinely believed that this was something that could be achieved and something that he had completely bought into, he thought he could get a pardon from it, he thought this was his way of being able to get back into the good graces of his children's lives.  He had two grandchildren that he had never even seen, and he believed that -- and it's true -- that because of his past and his criminal history, his children had separated themselves from him to a certain degree.  And as Mr. McGee had put it in his letter, he was looking and was very motivated to find a legitimate way to be able to fix

| | |
|---|---|
| 02:57:02 | 1 |

that, to fix his reputation and to be seen in a different light

after all these years where he has a lot of guilt and shame

over his prior or past and criminal conduct.

But for all those reasons, Your Honor, with Mr. McGee

as a complete intermediary and given what we know about the

project and its legitimacy, given what we know about

Mr. Alford's objectives here, I would submit that the current

guidelines far exceed sufficient but not greater than necessary

sentence, and I would adhere to my initial request of a

sentence of 24 months.

**THE COURT:**  Thank you, Mr. Lockhart.

Mr. Alford, is there anything you'd like to say today,

sir?

**THE DEFENDANT:**  May I speak with my counsel for one

minute, please, Your Honor?

**THE COURT:**  Yes, you may.

*(Conference between Mr. Lockhart and the defendant.)*

**THE DEFENDANT:**  Thank you, Your Honor.

**THE COURT:**  Is there anything you'd like to say today?

**THE DEFENDANT:**  No.  Yes, Your Honor.

**THE COURT:**  I'm sorry, I thought you said no.

**THE DEFENDANT:**  I would like to say something, please.

**THE COURT:**  You're fine where you are, as long as I

can hear you.  And because I do need to hear you, I appreciate

you standing, but I'm going to ask you to be seated because

02:58:51   1   you'll be closer to the microphone.

02:58:53   2           **THE DEFENDANT:**  Thank you.  I was going to ask you if

02:58:56   3   I could sit because my diabetes is kind of affected right now.

02:59:00   4           **THE COURT:**  It's fine for you to sit and I'll be able

02:59:00   5   to hear better, too, because you'll be closer, again, to the

02:59:03   6   microphone.  Go head, sir.

02:59:03   7           **THE DEFENDANT:**  Thank you.  And it is hard for me to

02:59:05   8   hear you, Your Honor.  So if I ask you to repeat, I apologize.

02:59:09   9           **THE COURT:**  Okay, I'll try to speak up.

02:59:12   10          **THE DEFENDANT:**  I'll try to be as brief as possible,

02:59:14   11  and I beg the Court's patience and forgiveness in advance if I

02:59:20   12  do get emotional.

02:59:24   13          I would rather be anywhere on God's green earth than

02:59:27   14  in front of you again here today awaiting your ruling for my

02:59:33   15  future.  And we all know I've been here multiple times in front

02:59:37   16  of you, and I'm cognizant of that fact, and I'm cognizant that

02:59:43   17  my criminal history has a significant play in how you will

02:59:49   18  adjudicate my sentence, but I would like to acknowledge that.

02:59:58   19          You sentenced me to ten months on a violation of

03:00:02   20  supervised release on July 31st, 2019.  I was released from

03:00:11   21  Saufley Field after completing those 10 months on January 6th

03:00:16   22  of 2020.  I was released from prison with nothing but the

03:00:22   23  clothes on my back.

03:00:22   24          *(Defendant crying.)*

03:00:29   25          Within a few months -- excuse me -- I felt like I had

03:00:35   1   a plan to seriously make something of myself.

03:00:44   2          I had been in constant communication with David McGee,

03:00:47   3   who had been, not only my attorney since 1991 -- excuse me --

03:00:52   4   1999, I considered him a friend and a mentor.  David and I

03:00:59   5   worked almost on a daily basis.  I asked him to be kind of an

03:01:04   6   accountability partner, and he helped me set up a consulting

03:01:08   7   firm.

03:01:09   8          I worked on three major projects of which are

03:01:14   9   discussed in my sentencing memorandum, one of which being the

03:01:19   10  Robert Levinson project, Your Honor.

03:01:26   11         I'm proud of the fact that I was able to completely

03:01:29   12  pay off all of my court costs in ten years in advance worth of

03:01:38   13  supervised probation costs.  I felt like I dotted every "i" and

03:01:48   14  crossed every "t" with regard to my probation.  I took it very

03:01:53   15  serious.  I was awarded privileges and not having to report on

03:01:56   16  a monthly basis.  I was allowed to make a telephone call.  I

03:01:59   17  was given a universal travel permit to travel anywhere within

03:02:04   18  the United States without asking permission, I just had to

03:02:08   19  alert the probation officer and let them know what I was doing.

03:02:11   20  I went above and beyond the call to do what I was trying to do,

03:02:16   21  which is the right thing.

03:02:18   22         The three projects that I was working on were,

03:02:21   23  obviously, very high profile, but fairly confidential projects.

03:02:28   24  They were high risk.  Obviously, the Robert Levinson rescue

03:02:35   25  attempt was one that was near and dear to my heart.  I had paid

03:02:41  1   attention to Mr. Levinson's plight.  He was captured at roughly

03:02:45  2   a year after I was sentenced and self-surrendered in 2006.  I

03:02:49  3   knew David was representing the family.  We had talked during

03:02:51  4   my ten years of incarceration.  I knew a lot about the Robert

03:02:54  5   Levinson situation.

03:02:56  6        When I came out, I watched David McGee's and Bob

03:03:00  7   Kent's attempts to rescue Robert Levinson, which they were

03:03:04  8   ongoing prior to me ever getting involved, but I was allowed in

03:03:10  9   kind of the inner circle through my contacts with David.

03:03:14  10       When Bob's attempt in mid summer of 2020 failed, he

03:03:21  11  felt it failed because of the government's interference.  I was

03:03:26  12  asked to get involved to try to help raise funds for the

03:03:31  13  subsequent project.

03:03:32  14       We all agreed that we didn't want to have any

03:03:35  15  government involvement, so we tried to devise a method which to

03:03:40  16  raise the funds through private investment.  That led me at the

03:03:49  17  point -- we got to the point in mid March of 2021, Bob Kent and

03:03:59  18  I, without David's knowledge, decided to approach Don Gaetz.

03:04:05  19  Arguably the worst decision I've ever made in my life.

03:04:12  20       Your Honor, I have no defense nor -- and I'm going to

03:04:14  21  read a couple of things I had put down, I hope you'll allow me

03:04:18  22  to do that.  Your Honor, I have no defense nor can I justify

03:04:21  23  falsely claiming that I had assurances from President Biden

03:04:27  24  when I told Don Gaetz I could guarantee his son Congressman

03:04:31  25  Matt Gaetz a Presidential pardon.  That statement was

| | |
|---|---|
| 03:04:35 | 1 |

untruthful.  I've never denied that.

When asked by the FBI on April 2nd in a couple-hour long interview, I described everything I did.  I never once denied making a false statement.  I claimed it was a lie at the time they asked me if it was true.  And there's just not been a day that's gone by that I regret the ill-planned and poorly executed attempt to raise the funds from Don Gaetz for the sole intention to fund Bob Kent's and my genuine attempts to rescue Robert Levinson from this 15-year-long captivity in Iran.

Any and all of the funds that I had requested would have gone to David McGee's trust account.  I don't have the -- I have a copy of the transcript that you were referring to where Mr. Gaetz wore a wire on our March 29th meeting.  And you can see on this document it's page 10.  It's subsequent to where you were reading and you and Mr. Goldberg were debating whether I said I wanted the million dollars for myself.

It's clearly Don Gaetz says -- I said "I do need a million in cash and I need $4.5 million in David McGee's trust account."

"So the cash would go to you and the 4.5" -- and it was cut off but that's Mr. Gaetz talking to me.

And I respond:  "I'd send it all to David."

**THE COURT:**  Right.  I think that Mr. Goldberg's issue with that is he doesn't believe you would send it all to David.

**THE DEFENDANT:**  I understand that.  And given my

03:06:40  1    history and given my prior criminal attempts, I can't fault

03:06:44  2    Mr. Goldberg for saying that.

03:06:46  3            But if you look at -- in my opinion, Your Honor, if

03:06:51  4    you look at what took place and what led up to it -- and I even

03:06:59  5    say in the transcript I would have to be the biggest idiot on

03:07:02  6    the planet -- which I acknowledge now that I am -- to try to

03:07:06  7    sit here and scam you, Don Gaetz, of all people, after your son

03:07:11  8    has -- no, this was prior to your son going on Tucker Carlson.

03:07:16  9            But the bottom line was there was never an intention

03:07:21  10   to get his money for myself.  Every penny would have gone to

03:07:25  11   Beggs & Lane.  And of course, we needed the funds, we needed

03:07:29  12   the cash.  The way we were going after the rescue is we had to

03:07:33  13   basically bribe members of the Iranian government to get Bob

03:07:38  14   out.  I didn't get into details of that in the discussion with

03:07:43  15   Don Gaetz.

03:07:44  16           I did tell him I don't want to have to tell you every

03:07:49  17   plan.  He's a politician, his son is a politician.  The last

03:07:52  18   person that I could tell the details of what we were going to

03:07:55  19   do would be him.  No disrespect.  But at the end of the day, we

03:08:00  20   didn't trust anybody in the government because, according to

03:08:03  21   David McGee and according to Bob Kent, their previous attempts

03:08:07  22   -- and I think it's been fairly well documented in the press

03:08:12  23   that there have been attempts to rescue Bob Levinson in the

03:08:16  24   past that have failed.

03:08:17  25           Now, I'll answer any question you might have with

03:08:21  1    regard to the million dollars or any of the money, Your Honor.
03:08:23  2    There is no way that I, as a convicted felon with the history
03:08:30  3    that I have, the history that I know Don Gaetz knew I had,
03:08:33  4    would have ever asked him for a penny that would have gone into
03:08:38  5    my pocket.
03:08:40  6            I mean, listen, that might be the most unbelievable
03:08:43  7    statement in the world, but at the end of the day, the evidence
03:08:47  8    shows we were trying to get David McGee the funds so he could
03:08:53  9    then manage us to go get Robert Levinson.
03:08:58  10           I can't put it any simpler than that, other than you
03:09:01  11   asking me any questions, which I'll be glad to answer.  My life
03:09:04  12   is on the line here.  I have -- I have admitted that I made a
03:09:08  13   false statement, that I was making untruthful statements to Don
03:09:12  14   Gaetz with regard to my ability -- or actually, my prior
03:09:18  15   discussions with the President of the United States.
03:09:22  16           I believed in my -- to this day, if I had proof of
03:09:26  17   life, I believe I could walk -- as I told him, I could take
03:09:29  18   Mr. Gaetz by the hand and we could go see President Biden.
03:09:33  19   That's how important a proof of life for Robert Levinson is.
03:09:38  20           We see all of the current press around the most recent
03:09:42  21   release of Trevor Reed, Brittney Griner.  Robert Levinson would
03:09:48  22   be that on steroids.  If I had proof of life that Robert
03:09:51  23   Levinson was alive and we had a reasonable chance, we wouldn't
03:09:55  24   have needed Mr. Gaetz's money.  But we needed to prime the pump
03:09:58  25   and that's why we were there.

03:10:00  1          I went about it in the worst way possible.  I should

03:10:03  2   have never brought up the information I had with regard to Matt

03:10:07  3   Gaetz.  Clearly wrong.

03:10:12  4          But I just would implore the Court to understand that

03:10:18  5   there's no way I could have gotten my hands on Mr. Gaetz's

03:10:22  6   money because it would have all gone to David.  And it wasn't

03:10:27  7   like David McGee, of all people, who I have the utmost respect

03:10:31  8   for and has the highest -- probably the most integrity of any

03:10:32  9   person I've ever met, was going to let me touch those funds

03:10:36  10  without Don Gaetz's permission.

03:10:39  11         I won't belabor the point.  I do want to say for the

03:10:43  12  record that David McGee and Bob Kent had no involvement in the

03:10:47  13  false statements that I made pertaining to Matt Gaetz.  I acted

03:10:52  14  alone and on my own in this regard.

03:10:58  15         David McGee and Bob Kent are men of high character and

03:11:02  16  personal integrity, both have devoted their entire careers to

03:11:05  17  faithful service to their country.  And for Congressman Gaetz

03:11:10  18  to repeatedly and falsely claim that our collective efforts to

03:11:15  19  rescue Robert Levinson, despite being tarnished by my

03:11:20  20  stupidity, as a deep state attempt to extort Don Gaetz is a

03:11:27  21  travesty.

03:11:28  22         Our sole goal was to raise the funds required to

03:11:33  23  arrange the release of Robert Levinson.  I am proud to have

03:11:36  24  worked alongside David and Bob, two men that I have great

03:11:40  25  respect for, and I apologize to them for the unwarranted and

| | | |
|---|---|---|
| 03:11:43 | 1 | unfortunate negative attention my actions have brought upon |
| 03:11:48 | 2 | them. |
| 03:11:48 | 3 | I also apologize to the family of Robert Levinson.  I |
| 03:11:54 | 4 | had hoped from the bottom of my heart to have played some small |
| 03:11:58 | 5 | role in reuniting them with their father and husband.  I am |
| 03:12:09 | 6 | convinced to this day that Robert Levinson is still alive, and |
| 03:12:14 | 7 | he will, God willing, be returned to them in the near future. |
| 03:12:20 | 8 | Lastly, Your Honor, I have two other apologies I wish |
| 03:12:25 | 9 | to make.  To Don Gaetz -- and if I may, I would like to turn |
| 03:12:28 | 10 | and speak directly to Mr. Gaetz. |
| 03:12:32 | 11 | **THE COURT:**  Mr. Gaetz, is that all right with you? |
| 03:12:35 | 12 | **MR. GAETZ:**  Yes, Your Honor. |
| 03:12:38 | 13 | **THE DEFENDANT:**  Thank you.  I apologize to you for |
| 03:12:40 | 14 | saying that I could guarantee a pardon and that I had |
| 03:12:43 | 15 | assurances from President Biden of a pardon for your son.  Both |
| 03:12:49 | 16 | of those statements were false, and I apologize. |
| 03:12:53 | 17 | To my wonderful -- even though they're not here, I |
| 03:12:59 | 18 | would like this to go on the record. |
| 03:13:12 | 19 | To my wonderfully incredible children, Megan, |
| 03:13:16 | 20 | Chandler, and Alexander:  I apologize to you for once again |
| 03:13:22 | 21 | putting myself in a position of being removed from your lives. |
| 03:13:28 | 22 | I am so incredibly grateful for the fact that each of you, |
| 03:13:33 | 23 | despite the fact that both of your parents were taken from you |
| 03:13:37 | 24 | at such young ages, have become such awesome adults, and I'm so |
| 03:13:42 | 25 | very proud of you. |

03:13:47   1          Judge Rodgers, thank you for allowing me -- for your

03:13:51   2   patience in allowing me the opportunity to offer these

03:13:55   3   comments.  I am ashamed of my actions.  I have tremendous and

03:14:07   4   genuine remorse and guilt, and I should live with the regret

03:14:11   5   that we were unable to bring Robert Levinson home to his loved

03:14:15   6   ones.

03:14:26   7          Had Mr. Gaetz agreed to our proposal, God as my

03:14:30   8   witness, I would have done everything in my power to see to it

03:14:33   9   that his son received a pardon.

03:14:40   10          I have one other comment based on the timeline that

03:14:44   11   was spoken.  And this is in no way, shape, or form trying to

03:14:48   12   shirk my responsibility, but I would have never spoken to Don

03:14:52   13   Gaetz again after we met with him the first day after we met

03:14:57   14   Don and -- Bob Gaetz met with him initially, I met with him in

03:15:03   15   the afternoon.  I was convinced Don Gaetz had no interest in

03:15:07   16   our proposal.  Bob and I sent a response back to Don the

03:15:11   17   following day thanking him for his time, telling him we were

03:15:14   18   moving on.  And we would have never gone back to Don Gaetz had

03:15:18   19   he not, with the insistence of the federal government, gone to

03:15:24   20   David McGee and that conversation -- the result of that

03:15:30   21   conversation was David was convinced that Don Gaetz was

03:15:33   22   genuinely interested and convinced that he wanted to be

03:15:36   23   involved in this project, and I made a follow-up phone call to

03:15:41   24   that summary of David and Don's meeting from David McGee.

03:15:50   25          That notwithstanding, I fully accept responsibility

03:15:52  1    for my actions, and I am fully prepared to bear the

03:15:56  2    consequences.  Once again, I thank you for your patience, and I

03:15:59  3    apologize for taking up so much of the Court's time.

03:16:02  4                **THE COURT:**  That's fine.  Thank you, Mr. Alford.

03:16:03  5                Mr. Goldberg?

03:16:06  6                **MR. GOLDBERG:**  Your Honor, I believe the victim would

03:16:08  7    like to make a statement, if it's acceptable.

03:16:12  8                **THE COURT:**  Yes.  Go ahead, sir.

03:16:31  9                **MR. GAETZ:**  Thank you, Your Honor.  If I had received

03:16:33  10   a message from Stephen Alford proposing anything certainly

03:16:38  11   involving money, I would have tossed it in the trash bin that's

03:16:41  12   reserved for crank mail that comes to anybody in public life,

03:16:46  13   because Alford is a serial confidence man and a repeat

03:16:50  14   criminal, and I knew that.

03:16:53  15              The scheme to defraud my family was presented to me by

03:16:58  16   Robert Kent, who represented himself as a former U.S. military

03:17:02  17   Special OPS officer, someone who had been under contract with

03:17:05  18   the State Department.  He said he was organizing the rescue of

03:17:09  19   Robert Levinson, an American who had been taken hostage in

03:17:13  20   Iran, tortured, and declared dead by the U.S. Government and

03:17:17  21   acknowledged as have being dead by his own family, but who Kent

03:17:23  22   claimed was actually alive and could be ransomed for

03:17:26  23   $25 million, $25 million to be provided by me.

03:17:31  24              In a document handed to me by Mr. Kent, I was

03:17:35  25   instructed to turn over the $25 million to David McGee, an

03:17:40 1    attorney in Pensacola.  I was urged to meet with Mr. McGee at

03:17:45 2    his law office, and Kent said that McGee, a former federal

03:17:49 3    prosecutor, would vouch for the players, verify the plan, and

03:17:53 4    handle the money.

03:17:55 5        In the same meeting with Robert Kent, I was informed

03:17:58 6    that my son, Congressman Matt Gaetz, was in immediate legal

03:18:02 7    jeopardy, would be indicted any minute, any day, based on grand

03:18:06 8    jury proceedings that Kent said he had access to.  But if I

03:18:11 9    turned over $25 million to David McGee for this hostage rescue,

03:18:18 10    than any legal problems my son might have would go away.  And I

03:18:22 11    was promised in that meeting -- in that document handed to me

03:18:26 12    by Robert Kent that President Biden would issue a Presidential

03:18:31 13    pardon.

03:18:32 14        The same day Robert Kent arranged for me to meet with

03:18:37 15    the third player, Stephen Alford.  Of course, then I knew that

03:18:41 16    this was a con.  And whatever else the scheme was, the hook was

03:18:46 17    to be a father's fear about his son's supposed indictment any

03:18:50 18    minute.

03:18:52 19        The story about my son, of course, was a lie.  There

03:18:56 20    was no pending indictment for any purpose.  But the characters

03:19:01 21    claiming access to a grand jury proceeding and to the Biden

03:19:06 22    White House were a man with a Justice Department background and

03:19:11 23    a man with State Department connections, and now Mr. Alford.

03:19:16 24        I immediately reported all of this that occurred to my

03:19:20 25    son and to my own legal counsel.  And on their strong advice

03:19:24   1   and on my son's insistence, I reported it to the FBI.  And then

03:19:31   2   at the FBI's request and under a written agreement with the

03:19:34   3   Justice Department, I wore a wire in meetings with Alford and

03:19:39   4   also with McGee, who confirmed the hostage rescue scheme,

03:19:44   5   confirmed the money, though now McGee said it could be done for

03:19:48   6   less than $25 million; and then later the price was, well,

03:19:51   7   maybe $5 million; well, we need a million-and-a-half in cash.

03:19:57   8          And imagine my stunned surprise when Mr. McGee told me

03:20:00   9   on an FBI wire that he, McGee, had been in the room when

03:20:04   10   Stephen Alford spoke by phone to officials in the White House.

03:20:09   11   Bolstered by the credibility of a former federal prosecutor and

03:20:13   12   an ex-State Department contractor, this plot was an attempt to

03:20:18   13   defraud me by falsely claiming that my son was in imminent

03:20:23   14   legal jeopardy and that only I could save him by handing over

03:20:28   15   millions of dollars to rescue a man who was already dead and

03:20:32   16   whose family had already suffered terribly during his

03:20:38   17   captivity.  It was a hoax.  It was a hoax from the beginning.

03:20:41   18          The crime in this case has caused harm to my family

03:20:45   19   and particularly to my son.  The drumbeat of media frenzy and

03:20:50   20   social media rumors and ridicule have been accompanied by death

03:20:55   21   threats to my son and harassment to my family.

03:20:59   22          But far more serious, Your Honor, than any harm to our

03:21:03   23   family, this crime has likely caused real suffering to the

03:21:08   24   family of the late Robert Levinson, a family in agony for years

03:21:13   25   during their husband and father's captivity and reports of his

03:21:17  1   prolonged torture and death.

03:21:19  2          And now, because of this crime, they had to watch

03:21:23  3   national television stories about the false claims by these

03:21:29  4   individuals of his being alive, of false hope used as bait in a

03:21:35  5   cruel hoax.

03:21:38  6          Now, Robert Kent and David McGee are not here today.

03:21:43  7   Stephen Alford is.  Alford is a serial con artist, a repeat

03:21:49  8   felon, by his own admission, and his commission of this

03:21:54  9   offense, he exceeded even his past colorful crimes.  He has not

03:21:59  10  and he will not change.  He must not be allowed to do anything

03:22:04  11  like this again.

03:22:06  12         Mr. Alford has proven that, if he's allowed to operate

03:22:10  13  outside the walls of a prison, he will only commit more crimes,

03:22:15  14  and there will be more victims, more harms, and more suffering.

03:22:21  15  And so I ask you, respectfully, to hold Stephen Alford

03:22:26  16  accountable.

03:22:27  17         Thank you, Your Honor.

03:22:28  18         **THE COURT:**  All right.  Thank you, sir, thank you very

03:22:31  19  much.

03:22:49  20         **MR. GOLDBERG:**  I'm not certain I can add a lot to that

03:22:53  21  recitation.  This Court is well aware that Mr. Alford is a

03:22:57  22  confidence man.  Part of that is using people in the community

03:23:01  23  such as what the victim just stated who have notable and

03:23:08  24  prestigious careers.  But it's after Mr. Gaetz meets with Mr.

03:23:17  25  McGee that the defendant does switch to the cash, *I need the*

03:23:20   1    *cash.*

03:23:22   2           **THE COURT:**  Mr. Goldberg, as Mr. Gaetz just spoke, and

03:23:27   3    it's referenced in the transcript, there's no evidence that

03:23:33   4    that money was going to go into Mr. Alford's pocket.  In fact,

03:23:37   5    I don't believe any suggestion that Dave McGee would allow any

03:23:42   6    bit of those funds to be used for any purpose other than the

03:23:46   7    one that was stated here, and that was this rescue attempt.

03:23:49   8           I can't speak to whether Mr. Levinson is dead or

03:23:53   9    alive.  I don't know enough about the case.  But I don't have

03:23:55   10   any doubt that Dave McGee and Bob Kent and, to an extent,

03:24:02   11   Mr. Alford -- certainly he's involved.  But that's what this

03:24:05   12   was about.  And you're just not going to convince me that

03:24:10   13   Mr. McGee was trying to defraud Mr. Gaetz.

03:24:13   14          **MR. GOLDBERG:**  I'm not trying to.

03:24:14   15          **THE COURT:**  But he was involved.  And you're

03:24:17   16   suggesting that the million dollars was going in Stephen

03:24:21   17   Alford's pocket.  There's no evidence of that.  You want me to

03:24:23   18   believe that because I know a lot about his criminal history as

03:24:26   19   a con man, and I do, I know an awful lot about it.  But I don't

03:24:31   20   have any evidence of that.  I have to base my decision in this

03:24:34   21   case on the evidence before me, not on what I suspect may be

03:24:37   22   the case.

03:24:38   23          **MR. GOLDBERG:**  And I'm not asking you to, Your Honor.

03:24:40   24   And again, that's why I'm quoting.  And we can have a

03:24:43   25   reasonable and distinct debate about what something means.  But

| | | |
|---|---|---|
| 03:24:47 | 1 | in Document 42 in paragraph 27(b), there is a distinction the |
| 03:24:53 | 2 | defendant makes after Mr. Gaetz meets -- |
| 03:24:56 | 3 | **THE COURT:**  Just give me some evidence, something that |
| 03:24:58 | 4 | that's where that million dollars was going was in his pocket. |
| 03:25:02 | 5 | **MR. GOLDBERG:**  Your Honor, I'm using his own words, "I |
| 03:25:05 | 6 | need a million cash in cash and four-and-a-half to Mr. McGee." |
| 03:25:12 | 7 | Those are two -- |
| 03:25:12 | 8 | **THE COURT:**  And Mr. Gaetz cut him off -- and I don't |
| 03:25:14 | 9 | mean intentionally, but obviously in the transcript you can |
| 03:25:17 | 10 | tell, and the next thing he said is "I'm going to send it all |
| 03:25:20 | 11 | to McGee." |
| 03:25:23 | 12 | Show me some evidence that that is not correct or |
| 03:25:25 | 13 | that's not true that that was going to happen.  I can't help -- |
| 03:25:28 | 14 | if you left out some of the transcript in your Statement of |
| 03:25:32 | 15 | Facts -- I'm looking at the transcript.  And if I'm wrong |
| 03:25:36 | 16 | reading the transcript, then tell me that. |
| 03:25:38 | 17 | But the fact that there's some statements from a |
| 03:25:41 | 18 | transcript in the PSR that are verbatim and some in the factual |
| 03:25:46 | 19 | basis that are verbatim but that leave out other statements in |
| 03:25:51 | 20 | the transcript that speak to the same issue, then I'm going to |
| 03:25:54 | 21 | look at the transcript. |
| 03:25:56 | 22 | **MR. GOLDBERG:**  Yes, Your Honor.  You and I are just |
| 03:25:59 | 23 | having a different interpretation of the transcript. |
| 03:26:01 | 24 | **THE COURT:**  Okay.  Well, tell me, then -- |
| 03:26:02 | 25 | **MR. GOLDBERG:**  And if the Court rules against me, that |

| | |
|---|---|
| 03:26:06 | 1 |

is why you're the Court.  There are two statements --

THE COURT:  I get to wear this robe, that's right.

MR. GOLDBERG:  Right.  But there are two statements in paragraph 27 of Document 42 where --

THE COURT:  I'm not looking at paragraph -- I'm looking at the transcript.

MR. GOLDBERG:  Your Honor, I'll get the transcript.

THE COURT:  That's what I'd like you to do and tell me how I'm reading the transcript wrong.

MR. GOLDBERG:  May I have the Court's indulgence?

THE COURT:  Yes.  This is the -- actually, I thought it was the date of the meeting.  I have here an assignment date of 4/6/2021.  I'm guessing the actual conversation predates that.  But this is between Mr. Gaetz and Mr. Alford.

MR. GOLDBERG:  All right, I am looking at the transcript on Document 43-11.

THE COURT:  Yes, it is, and I'm on page 10.

MR. GOLDBERG:  I'm on page 4.

THE COURT:  Well, I'll go to 4 first.  So I see where you're referring to, "I need a million in cash and 4 million in Dave McGee's hands" --

MR. GOLDBERG:  Right and --

THE COURT:  -- "that he will disburse as we tell him to do."  That's --

MR. GOLDBERG:  That's two different and distinct pots

03:27:31  1    of money, as the government interprets it.

03:27:31  2         **THE COURT:**  Right.

03:27:32  3         **MR. GOLDBERG:**  And 4.5 in his hands that Mr. McGee,

03:27:35  4    assuming the most honorable of intentions will work with.  But

03:27:38  5    the million dollars in cash is distinct.

03:27:44  6         **THE COURT:**  Right.  Well, if you go six pages beyond

03:27:49  7    to page 10, Mr. Alford says, "I do need a million in cash and I

03:27:53  8    need 4.5 million in Dave McGee's trust account."

03:27:57  9         Mr. Gaetz:  "So the cash would go to you and the 4.5"

03:28:01  10   -- and then it stops and Mr. Alford I guess cut Mr. Gaetz off

03:28:08  11   and said, "I'll send it all to David."

03:28:08  12        **MR. GOLDBERG:**  Yes.

03:28:10  13        **THE COURT:**  So what evidence do you have that that

03:28:11  14   would not have happened?

03:28:13  15        **MR. GOLDBERG:**  Because the defendant said twice that

03:28:16  16   he would take it.  That's part of the con.  That's the

03:28:19  17   government's interpretation.

03:28:20  18        **THE COURT:**  But what evidence do you have that

03:28:21  19   Mr. Alford -- that there's any indication that that would have

03:28:23  20   happened, other than those statements right there that

03:28:26  21   contradict the other statement that he made to Mr. Gaetz?

03:28:28  22        **MR. GOLDBERG:**  All I have is his statements, part of

03:28:33  23   the confidence scheme.

03:28:34  24        **THE COURT:**  But do you have anything where he had, you

03:28:35  25   know, entered into a contract to buy a house in Tahiti or

03:28:41  1  anything like that?

03:28:42  2         **MR. GOLDBERG:**  No, Your Honor, I do not.

03:28:46  3         Part of the Court's job --

03:28:48  4         **THE COURT:**  Please don't tell me -- I know what my job

03:28:52  5  is, Mr. Goldberg.

03:28:52  6         **MR. GOLDBERG:**  Your Honor, I was only going to refer

03:28:55  7  to 3553(a).  I wasn't going to ask the Court to do something in

03:28:55  8  particular.

03:28:55  9         **THE COURT:**  Okay.

03:28:56  10         **MR. GOLDBERG:**  Part of the Court's job is to refer to

03:28:58  11  and consider 3553(a), which is what I would ask the Court to

03:29:01  12  do.

03:29:02  13         I believe the first subsection is the nature and

03:29:05  14  characteristics of the defendant, which is the guiding force of

03:29:08  15  the government's, of course, as you would absolutely imagine,

03:29:12  16  argument here today, which is:  No matter what this Court does

03:29:15  17  or the state court has done, the defendant just comes out and

03:29:18  18  commits more crime.

03:29:19  19         In PSR paragraph --

03:29:20  20         **THE COURT:**  Is that why he's here but no one else is

03:29:22  21  here in terms of charges --

03:29:23  22         **MR. GOLDBERG:**  He is here because he is the only --

03:29:25  23         **THE COURT:**  Excuse me -- in terms of the charges in

03:29:27  24  this case?

03:29:27  25         **MR. GOLDBERG:**  No.  He is here because he is the only

03:29:30  1    one the government has evidence committed a crime.

03:29:32  2              **THE COURT:**  Okay.

03:29:34  3              **MR. GOLDBERG:**  I don't think the government, certainly

03:29:35  4    not me, has ever asserted differently.

03:29:38  5              **THE COURT:**  It seems like Mr. Gaetz might think

03:29:41  6    differently.

03:29:42  7              **MR. GOLDBERG:**  He might.  He's not a prosecutor.

03:29:44  8              **THE COURT:**  No, and I'm not either, and I'm not going

03:29:46  9    to tell you how to do your job.  I just am questioning why

03:29:50  10   maybe he's the only one here and it seems like it's his

03:29:53  11   criminal history to me, but that's just my --

03:29:55  12             **MR. GOLDBERG:**  The government has no evidence that

03:29:57  13   Mr. McGee or Mr. Kent committed a crime that is provable.

03:30:00  14   Otherwise, the government would have considered conspiracy

03:30:03  15   charges which it did not charge; it charged substantive counts

03:30:08  16   of wire fraud.

03:30:10  17             **THE COURT:**  I don't think you have evidence, I would

03:30:13  18   agree with you, as far as Mr. McGee.  I'm not so sure about

03:30:18  19   Mr. Kent.

03:30:18  20             **MR. GOLDBERG:**  Well, Mr. Kent --

03:30:18  21             **THE COURT:**  But I don't make those decisions.

03:30:18  22             **MR. GOLDBERG:**  No, Your Honor.  But Mr. Kent, I'll

03:30:19  23   inform the Court, if you actually track all the evidence we

03:30:20  24   have, immediately withdrew if there was a conspiracy, which

03:30:22  25   would make him not guilty under the law.  He forwarded the text

03:30:23   1   message, he set up the meeting, all at the behest of

03:30:26   2   Mr. Alford, and then he revoked.

03:30:28   3        I take my job, as Your Honor knows -- I've appeared in

03:30:31   4   front of you almost 20 years -- very seriously.  And I think,

03:30:34   5   as a matter of law, that would mean he would be not guilty,

03:30:36   6   before the actual scheme and the promises and the wire fraud

03:30:39   7   really took hold.

03:30:40   8        The defendant is here because he's the only one the

03:30:43   9   government could prove beyond a reasonable doubt committed a

03:30:45  10   crime.

03:30:45  11        **THE COURT:**  All right.

03:30:47  12        **MR. GOLDBERG:**  PSR paragraph 124 reads:  "Almost

03:30:51  13   continuously since 1999 the defendant has either been

03:30:55  14   incarcerated or involved in fraud.  The defendant was in BOP

03:31:00  15   custody from May 1st, 2006, to January 13th, 2015.  The

03:31:01  16   defendant was in state custody or federal custody from August

03:31:05  17   6, 2015, to January 6, 2020.  The defendant was on active state

03:31:09  18   probation supervision when he engaged in the instant offense of

03:31:13  19   conviction in March of 2021."

03:31:15  20        As the probation office notes, the defendant has

03:31:17  21   violated every prior term of court-ordered supervision.

03:31:23  22        So the question that I can't answer because, pursuant

03:31:27  23   to the plea documents, I will not be recommending a specific

03:31:29  24   sentence, is what is the incapacitation that should apply to a

03:31:34  25   defendant who just keeps doing it over and over again.

03:31:38    1    This certainly is a different crime than bank fraud,

03:31:41    2    it's certainly different than personal identification fraud,

03:31:45    3    other things he's been convicted of.  But it was still a scheme

03:31:48    4    to defraud, he pled guilty to it, and he's got a criminal

03:31:52    5    history that suggests he will not stop.  So I defer to the

03:31:55    6    Court as to what the appropriate sentence is.

03:31:57    7    **THE COURT:**  All right.  Thank you, Mr. Goldberg.

03:31:58    8    As we know, this is a continuation of a sentencing

03:32:01    9    hearing that began back -- April 18th, I believe, was the date.

03:32:06    10    I've stated the reason for my decision to vacate the

03:32:10    11    order that I entered on Saturday on the guideline objection as

03:32:16    12    to loss and -- well, intended loss.

03:32:20    13    That guideline range, as indicated earlier, the total

03:32:23    14    offense level is 29, Criminal History Category of V -- if I

03:32:27    15    overrule the objection -- it's 140 to 175 months, which is

03:32:33    16    roughly 12-to-14-and-a-half years.

03:32:37    17    Absent that additional 20 levels applying under the

03:32:49    18    guideline for intended loss, the total offense level would be a

03:32:52    19    10 -- I believe that's correct -- would be a 10 with the

03:33:00    20    acceptance of responsibility of 2 levels, which would be 10

03:33:04    21    with the Criminal History Category of V.  The recommended range

03:33:08    22    would be 21 to 27 months, essentially 2 years.

03:33:17    23    So, deciding the appropriate sentence in this case was

03:33:23    24    not easy.  On the one hand, Mr. Alford, there is a significant

03:33:30    25    aggravating factor, and you recognize it, but I don't know that

03:33:33   1   you recognize how significant it is, and that's your criminal

03:33:39   2   history.  I mean, it's just undeniable, your long history of

03:33:43   3   running cons.

03:33:44   4        And I'm going to outline it for the record.  You know

03:33:47   5   it well, so does Mr. Lockhart and Mr. Goldberg.  But for the

03:33:51   6   record:  In 2006, you were convicted of 36 fraud and related

03:33:55   7   offenses including 13 counts of wire fraud, 17 counts of money

03:34:02   8   laundering, one count of unlawful campaign contributions, and

03:34:03   9   one count involving and overarching conspiracy, as well as 4

03:34:08   10   counts of bank fraud that had occurred a few years earlier.

03:34:11   11        I sentenced you at that time to ten years'

03:34:14   12   imprisonment for those offenses.  The bank fraud was a guilty

03:34:18   13   plea; the other was a trial, as you know.

03:34:20   14        Around that same time, you were also convicted in

03:34:24   15   state court of grand theft and unlawfully conducting financial

03:34:28   16   transactions totalling nearly a million dollars.  You were

03:34:33   17   sentenced to five years' imprisonment for the state law

03:34:36   18   violations to run concurrent with the federal sentence.

03:34:38   19        You were released from BOP custody to begin serving a

03:34:43   20   three-year term of supervised release in January of 2015.

03:34:47   21   Within months of that release in January 2015, you were

03:34:51   22   committing more fraud, resulted in 10 new convictions in state

03:34:56   23   court, six counts of the criminal use of personal information

03:34:59   24   and four counts of communications fraud.

03:35:02   25        Those offenses and convictions led to another four

03:35:06    1    years in state prison, and then 10 months in federal prison for

03:35:10    2    the violations of supervised release by committing those new

03:35:14    3    offenses, your supervised release here on this judgment.

03:35:18    4          Within 15 months of your release from the BOP the

03:35:24    5    second time, you commit the offense in this case, and that's

03:35:29    6    while you were serving a 10-year term of state probation.  You

03:35:33    7    were on state probation when you committed the offense here.

03:35:37    8          So this history, it must be a driving consideration,

03:35:41    9    and it certainly is a driving consideration in the sentence

03:35:44   10    that I impose today.

03:35:46   11          With that said, I have a number of mitigating factors

03:35:52   12    that I believe exist in this case, in spite of the criminal

03:35:57   13    history, but in looking at the actual case itself.

03:36:00   14          No question wire fraud is a serious offense, no matter

03:36:06   15    what the underlying facts are.  But there is a spectrum.  And

03:36:10   16    here I think placing your offense on the high end of that

03:36:13   17    spectrum, which is what the guideline calculation does -- I

03:36:17   18    mean, the maximum that you can get under the statute is 20

03:36:20   19    years, and the guideline range -- the high end of it takes you

03:36:25   20    to 14-and-a-half.  I don't think that that's supported by the

03:36:29   21    record.

03:36:30   22          To begin with, no one else was charged.  I did take

03:36:35   23    note that the initial contact with Mr. McGee came through

03:36:42   24    Mr. Kent, not Mr. Alford.  Also, Mr. Kent acknowledges meeting

03:36:50   25    with Alford numerous times to plan the effort, including the

quid pro quo with undoing the criminal investigations of Mr. Gaetz's son.

And of course, we know that, as we heard from Mr. Gaetz just now, that Mr. Kent contacted him about this and referenced the pardon, yet Alford is here facing these charges alone.

And if the nature and circumstances of the offense were as egregious as to support a nearly 15-year prison sentence, I would expect to see charges against everyone that was involved.  Not Mr. McGee.  I don't think he was involved. I do think Mr. Kent was involved.  But that's not my place to make those decisions.  I'm not telling the government certainly how to charge its cases.  It's an observation I make at sentencing, however, and that is my prerogative.

Second and more importantly, there was no actual loss to any victim.  No money changed hands.  And from my review of the records, the funds would not have gone directly to Kent or to Alford.  Mr. Gaetz was told from the beginning that the funds would be used to contribute to the recovery effort and that they would go directly into Mr. McGee's trust account and his firm.  There is no evidence of any money going into Mr. Alford's pockets.  Mr. McGee said that no money would be distributed -- he told Mr. Gaetz that no money would be distributed out of his trust account without Mr. Gaetz's authorization.  Mr. McGee controlled that trust account.

|          |    |
|----------|----|
| 03:38:41 | 1  |

Now, Mr. Goldberg argues that there's this million dollars in cash that you wanted.  He and I, reading the same transcript, see a different thing, but I believe it's -- there's something different said on each of those pages.  But I don't know of any evidence to suggest that you were going to take that million dollars and do anything with it other than use it with Mr. McGee and Mr. Kent to try to rescue Robert Levinson.

I haven't heard anything to suggest that this was not a legitimate effort.  I believe Mr. Goldberg wants me to believe that you weren't legitimate but that others were, that Mr. McGee and Mr. Kent were, in terms of their genuineness about what these funds would be used for.  I can't do that. You were all operating in concert together to try to get this money to use it for this purpose, and I don't see anything in the record that tells me otherwise.

I don't know whether this would have ultimately been successful.  I don't know whether Mr. Levinson is still alive. But from everything I've reviewed, I do believe that Mr. McGee, Mr. Kent, and you believe that he is, and that you were going to use these moneys for that purpose.  Again, I don't know anything that tells me otherwise.  You might be wrong.  But again, in terms of the genuineness of your belief, there's nothing that tells me differently.

And I don't believe that David McGee was involved in

03:40:40  1   fraud or would have been involved in a fraud or that he would

03:40:43  2   have stewarded Mr. Gaetz's funds, had there been funds paid, in

03:40:50  3   any unlawful manner.

03:40:52  4       As has been stated here and is replete through the

03:41:01  5   record, Mr. McGee and Mr. Kent have been personally committed

03:41:06  6   to bringing Mr. Levinson home, personally and professionally

03:41:12  7   they've been invested in these efforts for years.

03:41:17  8       And, Mr. Alford, what's been suggested is that your

03:41:22  9   motive was to redeem yourself in your family's eyes, and you

03:41:27  10  wanted to see Mr. Levinson home for his family's sake.  I don't

03:41:37  11  have anything that tells me you were going to do anything

03:41:39  12  different with this money.  If I did, obviously my findings

03:41:42  13  would be different, but I don't, other than my suspicion about

03:41:50  14  your motives just because of your criminal history.  I can't

03:41:53  15  deny that.  But I don't base my decisions on suspicions.  I

03:41:57  16  base it on the factual record that's before me.  So I can't

03:42:04  17  make that finding.

03:42:05  18       However, there are your fraudulent statements, the

03:42:12  19  promises of a Presidential pardon.  There's no dispute --

03:42:17  20  you've admitted it here that these statements were made and you

03:42:21  21  admitted in your plea that they were false.  They should not

03:42:24  22  have been made.

03:42:26  23       Mr. Gaetz and his family didn't deserve that.  That

03:42:31  24  was obviously a very personal, very sensitive issue for

03:42:35  25  Mr. Gaetz and his family.  And to use that even for the purpose

03:42:47  1   that the record reflects you were going to use it for is wrong.

03:42:54  2   It was wrong to do that when you knew that you could not

03:42:57  3   guarantee anything of that nature.

03:43:04  4          And I guess the last thing is really the darkest and

03:43:19  5   most disheartening aspect of this case, and that is the fate of

03:43:24  6   Robert Levinson.  As I said, I don't know if Mr. Levinson is

03:43:31  7   alive or languishing in an Iranian prison.  He certainly was

03:43:40  8   the longest-held hostage in U.S. history.  I can only say that

03:43:46  9   my heart and my prayers go out for him and his family.

03:43:50  10         But I don't disagree at all with the government's

03:43:58  11  position and, obviously, Mr. Gaetz's position that the

03:44:02  12  statements that you made about Mr. Gaetz's son and what you

03:44:07  13  could do were just reprehensible to do that under those

03:44:14  14  circumstances.

03:44:15  15         So, as I view the record, Mr. Alford became involved

03:44:20  16  in a genuine effort to procure Levinson's release.  He wasn't

03:44:26  17  the mastermind behind it.  He made promises he couldn't keep.

03:44:30  18  He had no business making the promises.

03:44:32  19         That's why we're here, Mr. Alford, you made those

03:44:36  20  promises, and they're especially problematic in the context of

03:44:39  21  your 17-year history as a con man.

03:44:47  22         With that said -- and I'm being a bit repetitive, but

03:44:51  23  they didn't result in any actual economic loss.  I don't see

03:44:55  24  that you stood to personally gain financially from the fraud,

03:44:59  25  unless perhaps the recovery had been successful and there might

03:45:02  1    have been a financial award from the government.  But, as I

03:45:07  2    view the record, any funds would have gone into Mr. McGee's

03:45:13  3    escrow account for his oversight.

03:45:16  4          So my decision today is an attempt to balance the

03:45:25  5    3553(a) factors.  That's what my decision has to be based on,

03:45:33  6    it's what I consider.  And I do my best to balance those

03:45:37  7    factors in light of your personal history and characteristics

03:45:40  8    and in light of the personal history and characteristics and

03:45:45  9    the nature and seriousness of the offense conduct.

03:45:49  10          So, for those reasons, Mr. Alford, what I've decided

03:45:53  11    the appropriate sentence is in this case is a 63-month

03:45:59  12    sentence, so it's a five-year sentence.  It's not the sentence

03:46:03  13    the government was hoping for and it's not the sentence

03:46:07  14    Mr. Goldberg was hoping for.

03:46:09  15          In my mind, a five-year and three-month sentence is a

03:46:13  16    significant sentence.  And whether it will get your attention

03:46:16  17    or not, I have no idea.  But I simply can't justify in my mind,

03:46:22  18    under the 3553(a) factors, imposing a sentence of 12 to 14

03:46:27  19    years.  I just can't, not on these facts.  But I also can't

03:46:34  20    justify imposing a sentence of two years.

03:46:38  21          And so, again, the sentence I'm going to impose is 63

03:46:41  22    months, which actually happens to be within the guideline range

03:46:45  23    if the intended loss amount was one million under the -- with

03:46:53  24    the obstruction of justice and acceptance, I believe he would

03:46:57  25    be at 63 to 78 months, but regardless, that's just a footnote.

03:47:06    1          Mr. Alford, there will also be a period of supervision

03:47:09    2    of three years.  You have never successfully completed a

03:47:15    3    sentence.  I hope that this will be the exception and that

03:47:20    4    you're going to get through this one, you're going to get

03:47:23    5    through the 63 months.

03:47:27    6          You'll receive credit for time served.  I believe

03:47:29    7    you've been in custody for over a year now.  And then you'll

03:47:34    8    have three years of supervision.

03:47:45    9          I guess the message for you, Mr. Alford, is you just

03:47:51   10    can't make promises you can't keep and connect them to money.

03:47:56   11    Your sentences -- you're going to spend the rest of your life

03:47:59   12    in prison.  You've already spent a significant amount of time

03:48:03   13    in prison, and it's deserved, I mean, it's just deserved.  It's

03:48:08   14    just one fraud after another.  And this was a fraud.

03:48:12   15          Fortunately it didn't financially stress Mr. Gaetz

03:48:19   16    because he was smart enough to see this, when hearing these

03:48:26   17    promises coming from you, see it for what it was, that you

03:48:30   18    couldn't keep those promises.  His antenna went up, I'm quite

03:48:36   19    sure, he contacted his lawyer and it sounds like his son, and

03:48:40   20    then he contacted the FBI.  So thank God it didn't result in

03:48:44   21    him losing money and with no real hope of what you were

03:48:54   22    promising him would happen.

03:48:56   23          I'm going to impose the sentence now.  Mr. Alford,

03:49:00   24    before I do, did you say you served your -- your last time, was

03:49:04   25    that at FPC Pensacola?

03:49:07  1          **THE DEFENDANT:**  I'm sorry, Your Honor?

03:49:08  2          **THE COURT:**  Were you most recently in federal custody

03:49:12  3  at the Federal Prison Camp in Pensacola?

03:49:15  4          **THE DEFENDANT:**  Yes, Your Honor, that's correct.

03:49:16  5          **THE COURT:**  Is that where you did all of your time?

03:49:19  6          **THE DEFENDANT:**  No.  Are you talking from the

03:49:20  7  beginning in 2006?

03:49:22  8          **THE COURT:**  Where did you spend most of your time?

03:49:24  9  All over?

03:49:27  10          **THE DEFENDANT:**  I've been transferred all over, Your

03:49:29  11  Honor.

03:49:29  12          **THE COURT:**  But the violation of supervised release,

03:49:31  13  that ten months was in Pensacola?

03:49:34  14          **THE DEFENDANT:**  That was at Pensacola.  I served

03:49:36  15  roughly three months there.  Because it took about seven to

03:49:39  16  eight months to resolve that case, so most of it was at the

03:49:42  17  Santa Rosa County jail.

03:49:43  18          **THE COURT:**  Oh, I see, okay.  Well, I don't have any

03:49:46  19  problem with the BOP sending you back or to designating you to

03:49:51  20  Pensacola.  I don't know if they will or won't.  As you know,

03:49:57  21  really you can be sentenced anywhere to finish out this

03:50:03  22  sentence.  It won't be at the county jail, though.  You've been

03:50:06  23  there long enough.

03:50:11  24          **THE DEFENDANT:**  Your Honor, may I speak with my

03:50:12  25  attorney one second?

03:50:13  1      **THE COURT:**  You may.

03:50:14  2           *(Conference between Mr. Lockhart and the defendant.)*

03:50:38  3      **THE DEFENDANT:**  Thank you, Your Honor.

03:50:38  4      **THE COURT:**  All right.  And let me, before I impose

03:50:41  5  sentence, make sure it's clear on the record that, whether I

03:50:44  6  imposed a sentence under the guidelines with the intended loss

03:50:47  7  at 20 levels or without the intended loss, the sentence would

03:50:54  8  be the same, and I hope I've made the reasons for that clear.

03:51:01  9  But largely, Mr. Alford, it's due to your criminal history.

03:51:07  10          Mr. Alford, if you would, please rise.

03:51:11  11          *(Defendant complies.)*

03:51:11  12          Mr. Alford, at this time the Court does adjudicate you

03:51:21  13  guilty of Count Three of the superseding indictment.

03:51:25  14          Mr. Goldberg, does the government dismiss --

03:51:28  15     **MR. GOLDBERG:**  We'd move to dismiss all the remaining

03:51:30  16  counts pursuant to the Plea Agreement.

03:51:32  17     **THE COURT:**  Counts One, Two, and Four are hereby

03:51:32  18  dismissed.  Thank you.

03:51:35  19          I do find that the Presentence Investigation Report is

03:51:38  20  accurate for Mr. Alford.  I do order the findings of the report

03:51:38  21  incorporated into the following sentence:

03:51:42  22          Pursuant to the Sentencing Reform Act of 1984 and all

03:51:44  23  amendments to that law, it is the judgment of this Court that

03:51:47  24  the defendant, Stephen Michael Alford, is hereby committed to

03:51:52  25  the custody of the Bureau of Prisons to be imprisoned for a

03:51:54  1    term of 63 months.

03:51:55  2            I do recommend to the BOP that Mr. Alford be

03:51:58  3    designated to serve this sentence at FPC Pensacola or as near

03:52:05  4    to Northwest Florida as the BOP can reasonably accommodate.

03:52:09  5            Mr. Alford, I'm not going to impose a financial

03:52:13  6    penalty in your case, so a fine is not ordered based on your

03:52:21  7    inability to pay.

03:52:22  8            However, pursuant to law, there is a special monetary

03:52:25  9    assessment of $100.  That's for the one felony count of

03:52:28  10   conviction.  That's due and payable immediately.

03:52:30  11           When you're released from custody, you'll be placed on

03:52:33  12   a period of supervised release under the jurisdiction of this

03:52:35  13   Court for a term of three years.

03:52:38  14           You may be seated.

03:52:39  15           (Defendant seated.)

03:52:39  16           Supervision will be under the mandatory and standard

03:52:42  17   conditions adopted for use in this district including DNA

03:52:45  18   testing together with the special conditions listed in

03:52:49  19   paragraphs 109(a) through (f) of the Presentence Investigation

03:52:52  20   Report.

03:52:52  21           Mr. Lockhart, did you go over these conditions with

03:52:56  22   him?

03:52:57  23           **MR. LOCKHART:**  Yes, Your Honor.

03:52:57  24           **THE COURT:**  Any objections?

03:52:58  25           **MR. LOCKHART:**  No.

03:52:59    1    **THE COURT:**  All right.  I've considered, as I've said,

03:53:06    2    all factors in 18 U.S.C. 3553(a).  I do believe at this time

03:53:11    3    that the appropriate sentence in this specific case for this

03:53:14    4    specific defendant is 63 months' imprisonment, and I do find

03:53:18    5    it's sufficient but not greater than necessary to comply with

03:53:21    6    those purposes of sentencing set forth under that statute.

03:53:24    7         The total sentence, Mr. Alford, again, is 63 months,

03:53:28    8    three years of supervision, and a $100 special monetary

03:53:31    9    assessment.

03:53:32   10         I don't believe there to be an issue of forfeiture

03:53:35   11    here?

03:53:37   12         **MR. GOLDBERG:**  No, ma'am.

03:53:39   13         **THE COURT:**  Mr. Pearce, anything I'm overlooking?

03:53:41   14         **U.S.P.O. PEARCE:**  I don't believe so, Your Honor.

03:53:43   15         **THE COURT:**  Mr. Alford, as you know, you have the

03:53:45   16    right to appeal from this decision.  Should you choose to do

03:53:49   17    so, your notice of appeal must be filed within 14 days of the

03:53:53   18    date of the Court's written judgment.  That's once the written

03:53:57   19    judgment is filed in our court's electronic docket, not today's

03:54:00   20    date.

03:54:00   21         If you can't afford the cost of an appeal, you may

03:54:03   22    file for leave to appeal at no cost to you.  Mr. Lockhart will

03:54:06   23    talk to you further about your appeal rights.  Do keep in mind

03:54:10   24    the 14-day window is strictly enforced, and if you intend to

03:54:13   25    challenge my decision on appeal, you should do so within that

03:54:15  1   time frame.

03:54:15  2           Mr. Alford, I hope this is the end of this road for

03:54:21  3   you.

03:54:23  4           **THE DEFENDANT:**  Thank you, Your Honor.

03:54:23  5           **THE COURT:**  Mr. Gaetz, thank you for your

03:54:26  6   presentation.

03:54:26  7           And, counsel, we'll be in recess.

       8              *(Proceedings concluded at 3:54 p.m.)*

       9                    --------------------

      10   *I certify that the foregoing is a correct transcript from the*
           *record of proceedings in the above-entitled matter.  Any*
      11   *redaction of personal data identifiers pursuant to the Judicial*
           *Conference Policy on Privacy are noted within the transcript.*

      12

      13

           *s/Donna L. Boland                         9-16-2022*
      14   *Donna L. Boland, RPR, FCRR                Date*
           *Official Court Reporter*
      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25